**AFFIRM in part, REVERSE and REMAND in part; Opinion Filed April 8, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01156-CR

### MICHELLE BARRIGA-HERMOSILLO, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-82368-10**

## OPINION

Before Justices Bridges, O'Neill, and Murphy
Opinion by Justice Murphy

Michelle Barriga-Hermosillo appeals her convictions on one count of injury to her three-month-old child by omission and three counts of child endangerment. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2012); *id.* § 22.041(c) (West 2011). Appellant complains in her first two points of error, and the State agrees, that she was sentenced outside the range of punishment on two counts of child endangerment. She also challenges the sufficiency of the evidence to support her conviction for knowingly causing serious bodily injury to a child by omission and contends the court's charge for counts four and five (child endangerment by allowing the child to be in the presence of the father), and count six (child endangerment by not

providing medical personnel with accurate medical history) violated her Fifth Amendment protection against double jeopardy because those counts punish the same offense multiple times. We reverse and remand for a new punishment hearing on counts four and five and affirm the trial court's judgments on all other grounds.

**Background**

Appellant called 911 at 2:47 a.m. on July 23, 2010 because she believed her three-month-old son had a broken arm. She and the child were taken by ambulance to Plano Medical Center. The father, who was living with appellant at the time, remained at home. After initial tests at the hospital, the child was transferred to Children's Medical Center in Dallas because of suspected abuse.

Following an investigation, appellant was arrested a few days later and charged with six counts that included both reckless and intentional injury to a child, injury to a child by failing to seek medical attention, and endangering a child by allowing the father supervised and unsupervised access and by not giving doctors an accurate medical history for the child. Appellant, who was nineteen years old at the time of trial, received a "not guilty" jury verdict on the first two counts of reckless and intentional injury to a child and findings of "guilty" on the remaining counts. Seven witnesses, including appellant, testified at trial. Because appellant's points of error include a challenge to the sufficiency of the evidence, the testimony of the relevant witnesses is detailed below.

*Detective Chris Jones*

Plano Police Detective Chris Jones testified that CPS investigator Michelle Neely contacted him on July 23 regarding a three-month-old infant that was at Children's Medical Center in Dallas. Jones was assigned to the Crimes Against Children Unit and was responsible

for investigating offenses involving children, including injury and sex abuse cases, "anything that has to do with any of the victims being inside the home that reside with family members at that time."

Jones testified he met with Neely at the hospital. Appellant was with the child at the time. Appellant explained to him that the child had an arm injury. She said she had attempted to place the child's arm in a blanket to swaddle him and when she did this, she heard a "pop," knew something was wrong, and called 911. Jones asked appellant follow-up questions and then met with hospital staff and Neely.

The hospital staff told Jones and Neely the child had suffered multiple injuries, including a brain bleed, a spiral fracture of the left humerus, a sub-acute (healing) fracture of the left clavicle, a nondisplaced fracture of the occipital bone (cracked skull), healing fractures of three ribs on the left side, suspicion of healing fractures of three ribs on the right side, and torn and healed frenums of the upper and lower lips. The injuries described indicated they were non-accidental.

Jones then conducted a recorded interview of appellant to ask her what had happened at the residence that night. When he told appellant that her description of the arm injury was not consistent with the medical findings, she became upset and started to cry. She explained that on the night the child's arm was broken, she and the child's father "woke up" and the father went to the kitchen to prepare a bottle. She said she was attempting to tuck the child's arm into the blanket when she heard a popping noise. In response to Jones's questions, she said the father had never displayed any kind of anger problems or temper around the child. She also said she had never witnessed the father "do anything to the child."

In response to further questions, appellant described an incident two weeks earlier when the child was taken to the hospital due to continuous vomiting. She said the father had been walking with the child. He tripped and fell, and the baby fell onto the bed. Jones testified appellant said she made the hospital staff aware of that fall. But the medical records obtained from Children's Medical Center of Plano, where the child was taken for the vomiting incident, did not reflect that appellant made them aware of the fall. Jones opined that if the hospital staff had known of a fall, the staff would have taken x-rays; instead, they were led to believe the vomiting was a symptom of a virus, not a fall.

Jones testified that in his experience, abusers sometimes give false, misleading, or no information to medical personnel to avoid getting caught. He agreed appellant's behavior of not providing full information to medical personnel could be indicative of her trying to cover up abuse that was taking place in her home.

When Jones completed his interview with appellant, he conducted the same type of interview with the father. The father corroborated appellant's statement of how the child's arm was hurt and that he was making a bottle while appellant was with the baby. Regarding the prior fall, the father said he had been walking with the child, tripped on a cord, and the child fell from his arms. The father said appellant was "very angry" with him and that she "kicked" him out of the residence as a result of the incident. Conversely, appellant told Jones she made the father leave for reasons other than the child being injured.

Jones testified that as he and Neely were on their way to see the child, the father flagged them down. The father told them he wanted to "make things right" and indicated that his family thought he had anger issues. Jones and Neely took the father to a room, where he began to cry and said his mom was going to be angry with him because of his anger problem; he also said he

- 4 -

had not been honest with them when he talked to Jones the first time. He changed his story about the child's previous fall and said "the baby's head hit the wood frame of the bed." The father did not change his story about the injury to the child's arm.

Jones and Neely went to the residence later that evening and took pictures of the bed where the father said the head injury occurred. Jones also obtained an affidavit from doctor Cathleen Lang from Children's documenting the injuries reported to him earlier.

Three days later, which was the Monday following the Friday hospital visit, Jones reviewed appellant's 911 call. His review revealed a discrepancy in the story—appellant had told the 911 operator the popping noise occurred when she was pulling (rather than tucking) the child's arm from the blanket. Appellant and the father also participated in a recorded interview with Neely on that Monday. In that interview, appellant said the father had caused the injury to the child's arm and she had lied to cover up what he did. The recordings of the interviews conducted with appellant and the father were admitted as evidence and played to the jury.

Jones also testified to another incident described by the father, although not in one of the recorded interviews, when he said he accidentally dropped the child when he was holding him with one arm in the air. On that occasion, the child fell and hit his head on a baby swing next to the bed. Jones read from a letter that was admitted into evidence, in which appellant wrote to the father from jail, stating in part "I probably had something to do with his injuries too but none that I recall. You have to explain to me just like I just had to explain to you and I always did but you never listened. Maybe if we both wasn't so stubborn we would both have been better parents."

*Dr. Cathleen Lang*

Cathleen Lang, a board certified pediatrician, testified. At the time of trial, she also was a fellow in training to be a board certified child abuse pediatrician. She was working with the

REACH Program at Children's Medical Center of Dallas; REACH stands for "Referral, Evaluation of At Risk Children." With REACH, she works with children in the hospital; if any child comes into the emergency room and needs to be evaluated, a REACH physician will see the child.

Lang's involvement with the child began when he was transferred from the Plano Medical Center to Children's. She was consulted by the emergency room and the trauma teams. It is common for another hospital with an injured child to send the child to Children's; REACH becomes involved when there is a concern the injuries were not accidental or self-inflicted. The first thing she does is review the "films." She then talks to the parents to learn the child's past medical history and determine who lives with the child. Her inquiries include a family history, a history of present illness, why the child is at the hospital, and a detail of the circumstances surrounding the injury.

The history received from appellant was that the child was in his usual state of health and went to sleep the night before. He woke around 3:15 a.m., and appellant and the father gave him a bottle. "They said that he liked to be swaddled when he slept so mom wrapped him up. She said his left arm was sticking out so she tried to stick it back in, into the swaddled blanket and when she did that she heard a pop." Lang testified appellant said his arm was not twisted when she tried to put it in the blanket; it was bent at the elbow and against his body. When the arm "popped," the child started crying, and appellant noticed that his arm was "flopping." The parents woke appellant's mother to look at the child and then called 911.

Lang also requested the child's medical records from his primary care provider and the Plano Medical Center. The history provided to Plano Medical Center was slightly different from what was told to Lang because it indicated the child was swaddled and the parents were trying to

- 6 -

undo the swaddle when his arm popped. It also indicated the child was refusing to move the left arm after the pop. As part of her training, Lang looks for a change in history, which is a "red flag that there's something else going on."

Lang next talked to the emergency room trauma team and reviewed the CT scan of the head and skeletal survey. She described the skeletal survey as the x-rays of all the bones in the body. The purpose of that survey is to make sure they are not missing any other injuries that need to be addressed. The survey showed additional fractures. The CT, which shows the brain and any bleeding around the brain, showed new bleeding inside the child's cranium. There was also an area inside the cranium that was larger than it should have been and was described as looking "dirty." This meant the area was not as clear as it should have been and raised the concern there was old blood. They therefore obtained an MRI of the head.

Lang used a PowerPoint presentation to describe the child's injuries. She described the injury to his arm as a displaced spiral fracture, which results from twisting the arm with high force. She also described the causes of different fractures, noting there were two separate areas of the skull indicating two separate impact points. One of the fractures was a fracture of the occipital bone, located at the base of the skull. Lang testified this bone is thicker and "considerably harder to break" than other bones in the skull. The skeletal survey showed a healing clavicle fracture and three old fractures on the left front of the ribs. She described the callus that forms in seven to ten days for fractures, which is the reason for bringing children back in for further screening; often rib fractures are difficult to detect until that callus forms. The bleeding in the brain as shown on the MRI indicated what is commonly known as "shaken baby." She described for the jury the difference between the two brain bleeds, or subdural

hematomas, indicating that one was older than the other. She added that, based on a study, subdural hematomas that might occur during birth disappear within four weeks of the trauma.

The medical records indicated the child had been hospitalized overnight previously for vomiting. There was no mention in the records of his hitting his head. Had there been such an alert, they would have done a CT scan to look for bleeding, increased pressure, or other concerns inside the head. Instead, other causes of vomiting that were directed towards the intestinal tract were explored. The records contained no indication the child's clavicle had been broken, that he had been treated for broken ribs or hematomas, that he had skull fractures, or a torn frenum (which is the skin or tissue that connects the gums to the back of the lip).

Lang testified that when there are multiple fractures on different parts of the body and bleeding inside the head or the back of the eye like this child had, there really is no other explanation than "something happened" to the child or he was hurt. She opined that a parent should not continue to leave a child with a violent parent or a parent that has dropped the baby on its head; she said if a parent leaves the child with someone known to exhibit abusive behaviors towards the child, that action puts the child in danger of death, bodily injury, and physical and mental impairment. She said that once the child was placed in a different home, he no longer sustained fractures.

*Kara York*

Kara York testified she had been the child's foster mother for about eight months. She said he transitioned to his paternal great aunt for a period of time but returned a few months later. She said she and her husband were trying to adopt the child. York testified that at first he would wince and cry out when you held him and for the first six weeks, they visited Children's many times. Other than common colds and bumps and bruises from daycare, she was aware of no

physical or mental problems since the time he was placed in her care.  She testified it was too early to determine if there is residual damage from the brain injuries.

*Kyong Ellis*

Kyong Ellis testified she knew appellant because her daughter had a baby by the father's brother.  She had been around appellant and the father and observed he was controlling.  He also had a bad temper.

*Appellant Michelle Barriga-Hermosillo*

Appellant testified she was nineteen at time of trial and was living alone; previously she had been living with her mother.  She testified she never harmed the child and that from the time he was born until the time he was taken away, she took the child to his primary physician or to the emergency room six times.  Two of those times were emergency visits.  She never missed any of his appointments with the primary physician.

The first time she and the father took him to the emergency room, it was because "he kept throwing up."  She testified that before the first visit to the emergency room, she knew the child had fallen; she described an incident that occurred two weeks earlier when the father was playing with the child, holding him in the air with one arm.  The father accidentally dropped the child, and the child fell on the mattress next to his bounce chair.  She said she told the emergency room staff he had fallen on a mattress and was told that would not cause any injury.  According to appellant, the child "didn't even cry" when he fell.  The child was released from that hospital visit the next day with a stomach virus diagnosis.

The next emergency room visit was for the broken arm.  Appellant testified the father woke her because the child was crying.  She told him it was "fine" for him to feed the child and went back to sleep.  The father then woke her again saying the child was crying and he said,

"Babe, I think I broke his arm." She grabbed the child by his two fingers and his arm "kind of just fell." She ran for her mom and told her she thought the arm was broken. Her mom checked his arm and said "Yeah, it's broken" and took the child away from the father. Appellant called 911. She told the 911 operator what the father was "telling [her] in [her] ear." She told the hospital staff the "[s]ame story, [she] was trying to put the arm in the blanket and heard a pop." She corrected herself to say she did not personally hear the pop.

They arrived at Plano Medical Center and, after about thirty minutes, were transferred to Children's. At Children's, she told them the same thing—"I was trying to put the arm in the blanket for swaddling him and heard a pop." She testified she was unaware of any injuries that her child sustained prior to that day. That "same night," the father told her he had dropped the child before "but he fell on the bed." She was at the grocery store when that incident occurred. The father told her he thought he tripped over a wire and he fell on the bed with his hands around the child.

She told the hospital staff that she was the one that picked up the baby and heard the pop because the father "kept telling [her] to say that" and she "wanted to stay with the same story." She later came back to CPS and told them the truth once she realized everything that had happened to the child. She testified she "wasn't going to take the blame for nobody when someone hurt [her] son. If he hurt him then that was him. That was not [her] fault."

Appellant testified that previously she had told the father to leave her house because she did not like the way he was feeding the baby. They argued over "little things," and she was tired of the arguing, so she told him to go home. He had come to live with her and her mom when she came home from the hospital when the child was born. He had an angry nature before but had not physically abused her. She realized his anger when she saw him get into a fight at school.

- 10 -

The father moved out the night of the broken-arm incident, and she was arrested a few days later. She was in the Collin County jail for several months, during which she and the father exchanged letters. In one letter, she said she knew the father abused the child. She testified that while she was in jail thinking about what happened, she concluded that she "could have stopped this because the way [the father] used to feed him and [she] just came to the conclusion because of that." She also "put two and two together" after she learned of all the child's fractures. At least two of the letters were admitted as exhibits and portions of other letters were read to the jury.

Appellant testified she knew as a result of the events leading to the child's last emergency visit that she and the father both would "get in trouble." She expressed regret for "begging" the father to confess. She admitted the father used to shove the bottle in her child's mouth and she had told him to stop. She recognized there was a problem and knew there was a problem when she spoke to the police denying the father had anger management issues. She also was aware that the father could injure the child the way he picked him up, and she lied to the police about that. She also had problems with the way the father swaddled the child and pressed him down with a blanket. She admitted to an incident in the bounce chair where the father would rock the child's head harder when he cried. She also admitted telling the father not to do the things he was doing because she knew it was going to hurt the child. She denied her letter stating that "I knew all this sh-- was happening and I didn't do sh--" meant that she knew he was hurting the child.

Appellant said she was trying to understand why the child was always crying and agreed her mother had told her the child's cries sounded like he was in pain. She testified that some days, the child cried loudly for hours. She admitted she knew all the things the father was doing.

"[A]ll the people around" were telling her it seemed like the baby was in pain, and she did not do anything about it. In another letter to the father, she stated "You probably had something to do with his injuries too," acknowledging that she had something to do with the injuries. She understood the injuries the child had could affect him for the rest of his life and could have caused him serious bodily injury for the rest of his life. She testified that each time her child had a problem, she took him to the hospital or pediatrician. She denied ever having knowledge the father was abusing the child.

## Sufficiency of the Evidence

Appellant contends in her third point of error that the evidence is insufficient to prove she knowingly caused serious bodily injury to a child by omission. In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This standard recognizes the responsibility of the fact finder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We defer to the fact finder's credibility and weight determinations because the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See id.* at 326.

Appellant's sufficiency challenge relates to her conviction for count three, charging her with intentionally and knowingly causing serious bodily injury to her child by omission by failing to seek medical attention for him. *See* TEX. PENAL CODE ANN. § 22.04(a)(1). An omission that causes injury to a child is conduct constituting an offense if appellant has care, custody, or control of the child or a duty to act. *Id.* § 22.04(b).

- 12 -

Injury to a child is a "result of conduct" offense. *See Dusek v. State*, 978 S.W.2d 129, 133 (Tex. App.—Austin 1998, pet. ref'd). That is, the culpable mental state relates to the result of appellant's conduct. Thus, under section 22.04, it is not enough for the State to prove appellant failed to provide medical care for a serious bodily injury; rather, the State must prove the child suffered a serious bodily injury because appellant failed to provide him medical care. *Id.*; *see also Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985).

A person acts "knowingly" with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b) (West 2011). Proof of a culpable mental state often depends upon circumstantial evidence, and the requisite intent or knowledge may be inferred from any facts that tend to prove its existence, including appellant's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)); *Krause v. State*, 243 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Lang described for the jury the child's extensive injuries that were discovered by the hospital staff the night appellant brought him to the emergency room for his arm. She testified the only explanation for these types of injuries was that "something happened" to the child. Lang also testified that if a parent leaves a child with someone known to exhibit abusive behaviors towards the child, that action puts the child in danger of death, bodily injury, and physical and mental impairment.

Appellant argues there is no evidence that attributes any of the child's injuries to a lack of medical treatment. She claims he had no visible injuries and that she provided him with care when she knew he needed treatment, arguing she "took her son to the doctor for even minor conditions." The jury, however, heard testimony about how her child was "always crying" and

- 13 -

how she was "always trying to figure out why he was crying." Appellant agreed she had been told by "folks," including her mother, sister, and the father's mother, that the child's cry was not normal and it seemed like he was in pain. None of the child's medical records reflected that appellant mentioned the child cried like he was in pain.

Appellant also admitted she knew all the things the father was doing to her child but that she did not do anything about it. The evidence regarding appellant's knowledge included awareness of the father's anger issues by appellant and others; father's treatment of the child that included shoving bottles into his mouth, pressing him down under a blanket, and rocking the child's head harder when he cried. She also knew about at least one incident prior to the broken arm when she claimed the father tripped and fell with the child. That incident is the one the father changed his story about and confessed to Jones that the child had hit his head. The father also described that incident as the time appellant "kicked" him out. Yet there was no record of that fall in the medical records, and the child was diagnosed with a stomach virus on that first emergency room visit following the fall. Lang testified that if medical personnel had been alerted to the fact that the child had fallen and hit his head, additional tests would have been run to look for bleeding or other concerns inside the head. Appellant's mother also testified to the father's anger issues, and appellant confirmed the father's "controlling" behavior, although she would not call it abusive, regarding the child.

Appellant also changed her story repeatedly regarding what happened to the child during the incident involving the broken arm, which Jones and Lang testified was a sign of abuse. And although appellant could not see the fractures to her child's clavicle, ribs, and skull or the bleeding on his brain, she knew about the father's conduct. For example, she testified to the letter she wrote to the father while in jail, stating that she knew he abused the child and she

- 14 -

"could have stopped this because the way he used to feed him and [she] just came to the conclusion because of that." She claimed she previously told the father to leave the house because she did not like the way he fed the child and she had told him to stop. She also testified she knew the father had anger management issues even though she denied it when she spoke to the police, the father could injure the child the way he picked him up (about which she lied to the police), and she had problems with the way the father swaddled the child and pressed him down with a blanket. She admitted she told the father not to do the things he was doing because she knew it was going to hurt the child. Although she denied knowing the father was hurting the child, she wrote to him stating that "I knew all this sh-- was happening and I didn't do sh--." She also wrote to the father that he "probably had something to do with his injuries too," acknowledging her own involvement.

Appellant argues the evidence does not show she knew her son had untreated conditions or that she disregarded advice to seek treatment for her child. She states the child was discharged from Children's the day after his arrival with a splint on his arm, Tylenol for his pain, and instructions to return for more tests. She contends that despite Lang's testimony regarding what she observed on the child's CT and skeletal survey, none of these conditions were ever treated with surgery, additional medication, or extra procedures. But appellant testified she understood that the injuries her child suffered could have been deadly and could affect him for the rest of his life. The evidence shows appellant knew the father had anger issues and that he displayed abusive behavior toward the child; appellant identified the father as the cause of the child's injuries, and she admits she did nothing to stop his conduct. Further, the child exhibited signs of distress through his cries. Appellant admitted she was told by others that his cries were not normal and he seemed like he was in pain. She also admitted that when doctors were trying

- 15 -

to figure out what was wrong with her child during previous visits, she did not mention the fall or the fact that the child hit his head. Nor was she forthcoming about information related to his cries.

The jury had all of the above evidence to weigh, which included conflicts in what appellant and the father told investigators and medical personnel and conflicts in what appellant testified to at trial. Viewing this evidence in the light most favorable to the verdict, and deferring to the jury's resolution of credibility issues, a rational jury could have found beyond a reasonable doubt that appellant knowingly caused serious bodily injury to her child because she failed to provide him with medical care. We overrule appellant's third point of error.

### Improper Sentences

Appellant contends in her first two points of error that the trial court committed fundamental error by sentencing her outside the punishment range for two of her child endangerment convictions (counts four and five). Appellant was charged pursuant to count four of the indictment with "intentionally, knowingly, recklessly and with criminal negligence by act and omission, engag[ing] in conduct, to-wit: allowing [the child] to be in the presence of [the father] without supervision, and said conduct placed [the child] younger than fifteen (15) years of age, in imminent danger of death, bodily injury, and physical and mental impairment," which is a state jail felony. *See* TEX. PENAL CODE § 22.041(c), (f). Count five of the indictment was identical to count four with the exception of omission of the words "without supervision." Both counts identified a state jail felony, for which the range of punishment is confinement for 180 days to two years and an optional fine of up to $10,000. *Id.* § 12.35(a), (b) (West Supp. 2012).

The trial court instructed the jury under these counts that the punishment range was "not less than two years nor more than twenty years" in the state penitentiary. The trial court also

instructed the jury they could assess a fine in any amount not to exceed $10,000. The jury returned a guilty verdict on both counts and assessed punishment at five years in prison for count four and ten years probated for count five. The trial court's written judgment on the jury's verdict reflects a conviction under Texas Penal Code section 22.041(e), a second degree felony. *See id*. § 22.041(e). Trial counsel did not object to the jury instructions or the judgment.

A trial court commits fundamental error by allowing conviction for anything but the charged offense or a lesser included offense. *Ivory v. State*, 632 S.W.2d 614, 616 (Tex. Crim. App. [Panel Op.] 1982). A sentence outside the range of punishment is unauthorized. *Mizell v. State*, 119 S.W.3d 804, 806 (Tex. Crim. App. 2003); *Speth v. State*, 6 S.W.3d 530, 532–33 (Tex. Crim. App. 1999) ("[A] defendant has an absolute and nonwaivable right to be sentenced within the proper range of punishment established by the Legislature."). No trial objection is required to appeal an unauthorized punishment. *Mizell*, 119 S.W.3d at 806 n.6. The proper remedy for unauthorized punishment is a new punishment hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 44.29(b) (West Supp. 2012); *Splawn v. State*, 160 S.W.3d 103, 107–08 (Tex. App.—Texarkana 2005, pet. ref'd). The jury convicted appellant of a state jail felony, but the trial court allowed punishment for a second degree felony. Accordingly, appellant is entitled to a new punishment hearing for her conviction on counts four and five of the indictment. We sustain appellant's first two points of error and remand for a new punishment hearing on those counts.

## Double Jeopardy

Appellant asserts in her fourth point of error that her convictions for endangering a child in counts four, five, and six allege the same date, victim, mental states, and degrees of danger and thus violated her Fifth Amendment protection against double jeopardy because those counts

punish the same offense multiple times. The State responds that appellant failed to preserve her complaint and that no double jeopardy violation is shown.

To preserve a double jeopardy complaint, a defendant must raise the complaint "in some fashion" at or before the time the trial court submits its charge to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000). A double jeopardy violation may be raised for the first time on appeal when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and no legitimate state interest is served by enforcement of the usual rules of procedural default. *Id.* at 643; *see also Langs v. State*, 183 S.W.3d 680, 682 (Tex. Crim. App. 2006) ("In this case we reiterate that the face of the trial record must clearly show a double jeopardy violation before a defendant may successfully raise a 'multiple punishment' double jeopardy claim for the first time on appeal."). When raised for the first time on appeal, appellant has the burden of presenting a record showing on its face a multiple punishments violation. *Gonzalez*, 8 S.W.3d at 645.

Appellant never objected to counts four, five, and six based on double jeopardy or any other constitutional grounds. She cites the following exchange to suggest she preserved a complaint:

> [DEFENSE COUNSEL]: Page 14, Count 4 it says "we, the jury, find the defendant guilty of abandoning or endangering a child as charged in the indictment." The same thing on Count 5 and the same thing on Count 6, all of them the same language.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: Your Honor, I'm trying to find out what – you have three same questions
>
> THE COURT: Well, if you read the body of the charge Count 4 is without supervision, Count 5 doesn't have any question about supervision and Count 6 is for abandoning and endangering.

Now, they all constitute abandoning or endangering but they're all just different methods.

This exchange, however, shows no constitutional objection or an objection that would "in some fashion" suggest a double jeopardy violation; it was an exchange that occurred during a discussion in the charge conference about a "reference to deadly weapon." *See id.* at 642. Accordingly, we conclude appellant failed to preserve her double jeopardy claim.

We also conclude appellant did not meet her burden to raise a double jeopardy violation for the first time on appeal. The face of the record does not show a clear double jeopardy violation. Rather, the separate counts alleged focus on different conduct engaged in by appellant that placed her child in danger of serious bodily injury—that is, the counts alleged different methods in which she endangered her child (allowing the child to be in the father's presence without her supervision, allowing the child to be in the father's presence when she was also present, and failing to provide medical personnel with accurate medical history). And requiring appellant to have timely raised her double jeopardy claim in the trial court served legitimate state interests and is consistent with the underlying policies of the general rules of procedural default. *Id.* at 645. "Timely raising the matter in the trial court would have provided the trial court and the prosecution an opportunity to remove the basis of the objection" and allows the prosecution a chance to obtain a conviction "without the risk of an unnecessary retrial in the face of a valid multiple punishments claim." *Id.* at 645–46. We therefore overrule appellant's fourth point of error.

## Conclusion

We affirm the trial court's judgments of conviction for each count but reverse the portion of the judgments related to counts four and five assessing punishment. *See* TEX. CODE CRIM. PROC. ANN. art. 44.29(b). We remand this case for a new trial on punishment on counts four and five.

*/Mary Murphy/*

MARY MURPHY
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

111156F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHELLE BARRIGA-HERMOSILLO, Appellant

No. 05-11-01156-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 429-82368-10.
Opinion delivered by Justice Murphy.
Justices Bridges and O'Neill participating.

Based on the Court's opinion of this date, the judgments of the trial court as to Counts III, IV, V, and VI are **AFFIRMED** as to guilt. That portion of the judgments for Counts IV and V assessing punishment is **REVERSED** and the cause **REMANDED** for a new punishment hearing on Counts IV and V pursuant to TEX. CODE CRIM. PROC. ANN. Art. 44.29(b).

Judgment entered this 8th day of April, 2013.

/Mary Murphy/

MARY MURPHY
JUSTICE