**AFFIRM; and Opinion Filed July 3, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-13-00578-CR
_____

### MONIQUE DANAE MCCLINTON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law**
**Rockwall County, Texas**
**Trial Court Cause No. CR11-1799**

## MEMORANDUM OPINION

Before Justices Bridges, O'Neill, and Brown
Opinion by Justice Brown

Monique Danae McClinton appeals her conviction for the offense of cruelty to animals. In two issues, she challenges the trial court's decision to grant the State's motion to strike words in the information and the sufficiency of the evidence to support her conviction. We affirm.

### Procedural Background

On October 22, 2011, the City of Rockwall Animal Services in conjunction with the Rockwall County Sheriff's office seized thirty-four dogs from property located in Royse City that appellant leased with her husband, Wyakie Glenn Hudson. The dogs, all of which were American Pit Bull Terriers, belonged to appellant and Hudson. Twelve of the dogs were six- to- eight-week old puppies, and one dog was an adult female named "Baby G" that had just given birth to six puppies. The remaining dogs were adults or older puppies.

The State charged appellant by information in thirty-four cases with the Class A misdemeanor offense of cruelty to animals, alleging appellant committed the offense by failing to unreasonably provide food or water or care or shelter for the dogs. *See* TEX. PENAL CODE ANN. § 42.092(b)(3) (West 2011). The State went to trial on three of those cases—one case involved a six- to eight-week old puppy, another case involved a six-month old puppy, and the other case was for Baby G. Appellant waived a jury and pleaded not guilty in each case.

After a bench trial, the trial court found appellant guilty in the case involving Baby G and not guilty in the other two cases. The court sentenced appellant to 365 days in the Rockwall County jail, which was suspended pending fifteen months of community supervision, and assessed a $400 fine. The court also ordered appellant to pay $210 in restitution and court costs. Appellant moved for a new trial, which the trial court denied. This appeal followed.

### Motion to Strike Words in the Information

Appellant argues in her first issue that the trial court reversibly erred when it granted the State's motion to strike certain words in the information after trial had commenced and over her objection. The information alleged appellant:

> did then and there intentionally, knowingly, or recklessly fail unreasonably to provide necessary food or water or care or shelter for an animal, to-wit: a grey and white adult female American Pit Bull Terrier in [appellant's] custody, *by not providing food, water, and reasonable living conditions . . . .*

(Emphasis added).[1] The day before the start of trial, the State filed a "Motion to Strike Words of the Information," asking the trial court to delete the above italicized words from the information and allow the State to proceed to trial on the remaining part of the information. The trial court addressed the motion to strike at the start of trial, after the parties announced they were ready and

---

[1] We note that the information previously had been amended before trial by adding the kennel card identification number so that the particular American Pit Bull Terrier (Baby G) could be identified with greater specificity.

appellant had entered her pleas of not guilty. The trial court granted the motion over appellant's objection, and the case proceeded to trial.

Appellant argues the removal of the above language constituted an amendment to the information because it deleted the manner and means of how the alleged offense occurred. She maintains that permitting a trial amendment over her objection violates article 28.10(b) of the Texas Code of Criminal Procedure and because the trial court struck a "specific means of committing cruelty to animals" that the State was required to prove, she was harmed by this error. The State responds that the deleted language was surplusage and repetitious of other language that remained in the information and its deletion did not constitute an amendment under article 28.10(b). The State adds that there was no error in striking the language because the trial court made no substantive change to the information or the State's burden of proof and the manner and means alleged in the information was unaffected by the trial court's decision to strike the subject language.

An information may be amended after trial begins if the defendant does not object; if there is an objection, the information may be amended only if the amendment does not charge the defendant with an additional or different offense. TEX. CODE CRIM. PROC. ANN. art. 28.10(b), (c) (West 2006). But not every change to the face of an information is an amendment. For example, an information may contain "surplusage," which is unnecessary words or allegations in the information that do not describe what is legally essential to constitute the offense charged. *Hall v. State*, 62 S.W.3d 918, 919 (Tex. App.—Dallas 2001, pet. ref'd). The deletion of words that are surplusage is not an amendment of the information; rather, such a change is merely an abandonment, which does not implicate article 28.10. *Id.*; *Garza v. State*, 50 S.W.3d 559, 563 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

We agree that the deleted language constitutes surplusage, which may be abandoned at any time without triggering the prohibition of article 28.10. While the words "by not providing food, water, and reasonable living conditions" describe how one commits the charged offense, the words also are repetitive of other words that remained in the information that describe the same element—specifically, "fail unreasonably to provide necessary food or water or care or shelter." *See Maldonado v. State*, Nos. 05-05-01386-CR, 05-05-01387-CR, 2006 WL 3291045, at *3 (Tex. App.—Dallas Nov. 14, 2006, pet. ref'd). The words that remained also mirror the description of the offense in the penal code. *See* TEX. PENAL CODE ANN. § 42.092(b)(3); *cf. Haecker v. State*, 571 S.W.2d 920, 921 (Tex. Crim. App. [Panel Op.] 1978) (information is sufficient if it follows language of the statute if that statute completely describes the offense such that it informs accused of the nature of the charge). Because the necessary element of how the offense was alleged to have been committed remained in the information, the deletion of the words "by not providing food, water, and reasonable living conditions" did not alter or affect the substance of the charged offense or the State's burden of proof and thus, was not an amendment to the information. *See Hall*, 62 S.W.3d at 919. We therefore conclude the trial court did not err in granting the State's request to delete the words "by not providing food, water, and reasonable living conditions" from the information. We overrule appellant's first issue.

**Sufficiency of the Evidence**

Appellant contends in her second issue that the evidence is insufficient to support her conviction for cruelty to animals in the case involving Baby G. We review appellant's sufficiency challenge by considering all the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim.

App. 2012).  Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319.  We presume the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination.  *See id.* at 326.  We do not reassess witness credibility.  *Id.* at 319.

To obtain a conviction against appellant as charged in the information, the State was required to prove beyond a reasonable doubt that appellant intentionally, knowingly, or recklessly failed unreasonably to provide necessary food, water, care, or shelter for an animal, Baby G, in her custody.  *See* TEX. PENAL CODE ANN. § 42.092(b)(3).  "Necessary food, water, care, or shelter" includes the food, water, care, or shelter that is "required to maintain the animal in a state of good health."  *Id.* § 42.092(a)(7).  Although there are exceptions to the application of the offense to the conduct of the person, none of the exceptions are applicable here.  *Id.* § 42.092(f).

### *Evidence Presented at Trial*

The State's evidence consisted of testimony from six witnesses and photographs.  Its first witness was Peggy Wyda, who lived across the street from the leased property.  Wyda was the person who called the Sheriff's office about the dogs on October 22.  This was the second call made by Wyda; she called on October 19 to report that "there were dogs on this property, and nobody lived there."  Wyda testified that after the first call, the Sheriff's office told her there was nothing they could do.  But she insisted they respond when she phoned a second time.  Wyda said the dogs had been barking loudly and she had not seen anybody come to the property in a few days.  She testified she was "alarmed" by the smell of dog feces and urine, which was "even worse" than when she called on October 19, and upon closer inspection, she did not see any food or water for the dogs.

Rockwall County deputies Abel Chavez and Brian Lee Earles testified next. Chavez responded to the dispatch to check on the welfare of dogs at the property. Chavez testified he could not see much from the gate entrance to the property. But he could hear a lot of dogs barking, and he smelled a strong odor of feces. After obtaining permission from the owner, Chavez cut the lock to the entrance gate and entered the property. Earles joined Chavez as they moved onto the property.

The first thing Chavez saw as he entered the property was a brush pile made up of sticks and twigs blocking dog crates. The crates were covered by blue tarps and contained "a lot of puppies." He also saw an adult dog, later identified to be Baby G, inside a crate with her newborn puppies. Three of the puppies were dead; two of the dead puppies had been mutilated. Chavez said Baby G tried to stand up, but she was too tall for that particular crate.

According to Chavez, Baby G did not look well-fed and he could see her ribcage and bones; she looked like "she needed attention, medical attention." Chavez also noticed spots all over her body, like a rash, and she had scars. Earles said Baby G's spine, ribs and hips were protruding and that she did not look healthy. Neither deputy saw any food inside her crate. Chavez described the water he saw in the crate as "dirty, dirty water" that looked oily. Chavez did not think the container holding the dirty water had been filled the day before. Earles agreed the water was not fresh and appeared "[o]ily and stagnant." Earles believed it may have been several days since someone provided the dogs with water. Earles said they "checked all over the place" and did not "find any fresh food or water for any of the dogs." The two crates containing puppies also did not contain any food or water. The panel underneath the floor of the crates had a lot of feces and old food.

Thirty or forty yards from the crates were larger dog kennels containing several adult dogs and older puppies. The odor of feces from the kennels was "pretty strong." One of the

kennels, which contained three dogs, did not have any shelter for the dogs. Earles saw some "mushed, old-looking, nasty-looking food" in just one of the kennels, and the water buckets in the kennels contained "more stagnant water."

Based on the lack of food, water, shelter, and care, Earles procured a warrant to seize the dogs and assisted animal control officer Joyce Ross, who was dispatched to the property, with the seizure. Photographs were taken at the scene. Ross testified that when she first arrived, she could not see the dogs because there was a lot of brush and wood stacked up around a set of trees. But she could hear the dogs and "smell the dogs" before she saw them. She moved around the brush pile and saw the crates that were covered with blue tarps. She saw "numerous puppies" in two of the crates and Baby G in a third crate; a fourth crate was empty. Ross saw three dead puppies in the front of Baby G's crate. Two of Baby G's other puppies were "gasping" and "expressing foam out of their mouth[s] and nose[s]." Ross removed Baby G from the crate so she could assess the babies. Ross performed CPR on the puppies, which "didn't work" because the puppies were overheated. Ross explained that it was "very warm" that day and the live puppies were "overly warm" to the touch. A sixth puppy was stronger but later died at the shelter.

Other than Baby G and her six puppies, Ross saw only a bucket with what appeared to be stagnant water with a layer of greasy film on top inside the crate. There was very little water inside the bucket. She did not see any food. The bottom of the crate had feces, vomit, and urine. Ross testified the crate was "way too small" for Baby G to stand up in "so she was hunched over in the kennel." Ross described Baby G as "very skinny," "emaciated," and "in very poor condition." Ross could see "every one of [Baby G's] ribs" and the joints in her tail. Baby G's skin also had issues, which Ross said looked like mange, and her ears stunk as if she had an infection. Ross testified that all the puppies in the nearby crates also appeared to have mange.

In the puppy crates, Ross saw empty bowls, one of which looked like a large pie pan. Ross testified the pan had "about an inch of feces and urine squashed down in it." The puppies did not have any water. Ross described the puppies as living in crowded conditions, extremely hot to the touch, and "very skinny, very underweight." Ross also testified that there was no water in some of the adult kennels. One kennel had a large tub with about an inch and a half of muddy water in the bottom. That kennel had no shelter for the three dogs in it, and there were feces all around. Ross said the adult dogs ranged from skinny to mildly skinny. Some of the dogs had scars and skin issues.

Ross gave the dogs food and water. At one point, appellant arrived at the property after being called by the deputies. Ross testified that appellant said she had come to feed the dogs. According to Ross, appellant brought only "two little 2 gallon/3 gallon water jugs." Ross did not see the food appellant brought, but appellant said she had small bags of food in her car.

Ross took the dogs to the animal shelter where she provided them with care. The dogs also received an examination by John Keith Taylor, a veterinarian. Photographs were taken of Baby G at the shelter and admitted as exhibits. Taylor testified that Baby G was "obviously underweight." Taylor said Baby G's added nutritional requirements from being pregnant and lactating "could have brought her to this condition." And he would expect a pregnant or nursing dog to have her diet supplemented or increased to "prevent this type of thing." But even with a dog that has adequate nutrition, Taylor confirmed that the dog "shouldn't be this thin." Taylor described Baby G's body condition as poor and said she was "undernourished." Taylor testified he believed the pregnancy and lactation contributed to her weight loss; his notes indicated that Baby G was "very thin due to pregnancy, lactation." But he said an adequately fed female dog should lose zero body weight during a normal pregnancy. According to Taylor, at this stage in the pregnancy, Baby G should be fed a minimum of once a day, and the owner "can get a little

more nutrition" in her if she is fed two or three times a day. He stated that a dog does not get this thin if the owner is feeding the dog regular adult dog food at a regular volume. Taylor referenced the photographs taken of Baby G at the animal shelter, testifying that the "picture speaks louder than the body score does." He said that although Baby G was thin, "she wasn't being starved to death." Taylor did not see evidence of dehydration with the dogs.

Taylor testified to his familiarity with "whelping pens," which was the term used to describe the crate holding Baby G. Taylor explained that a "whelping pen is a pen that allows the puppies to be contained and the mother to be able to enter and exit." Taylor said one of the crates brought from the property looked as if it could be big enough to be a whelping pen if the mother had the ability to get in and out of it. He testified the crate "would be kind of cramped" for a permanent type of confinement but that it would be an adequate whelping pen if it were cleaned a minimum of two times a day.

The State's final witness was James Cantrell, who was trained in animal cruelty investigations. Specifically, Cantrell testified that after looking at the photographs and the condition of the animals, in his opinion, "the animals were not cared for according to state law." Cantrell reviewed the photographs of Baby G. He said the fact that her bones protruded told him that Baby G had been subjected to a long-term "lack of adequate food." And even if you consider the fact that she just gave birth to six puppies, Cantrell testified that "if she was in a normal, healthy body weight before giving birth, then she would not be in this condition already." He added, that if "she were receiving adequate sustenance, she wouldn't even be in that condition after she had been nursing for eight weeks." Cantrell opined that the owner of Baby G did not provide adequate food to maintain her in good health. Although he could not say that Baby G had not been provided with any food, from looking at the photographs, he estimated

that Baby G had not been fed appropriately for at least a month to six weeks. He testified: "You can't look at a dog that's that skinny and think that it's okay."

Cantrell also reviewed a photograph of the bucket of water found in Baby G's crate. Cantrell testified that in his experience, the oily film on the water is caused by a dog stepping in the water and contaminating the water with the oil from her skin. He also said that if the dog was stepping in the water, the water would contain whatever the dog walked in from the ground. Cantrell testified that this water was not fresh or necessary water to maintain the health of Baby G. Cantrell also had concerns about the bucket of water found in the kennels. He said that because of the size of those buckets, the dogs had to step into the buckets so they could reach the water. That meant the dogs would contaminate the water with whatever they stepped in, like grass or feces. Cantrell said he would not be surprised by the fact that the dogs were not dehydrated. He clarified that he did not say there was not water available; he said the water was not "healthful water." According to Cantrell, "dogs will drink whatever they have to drink if it's a matter of survival." In his opinion, "dehydration is not the only unhealthy condition that can arise from having unhealthful water."

Cantrell testified that the crate that housed Baby G was not appropriate confinement for a dog of her size. Cantrell reviewed the photographs of Baby G in the crate and observed that Baby G could not stand up fully or raise her head to its normal position. He added that for a dog this size, the crate typically does not have a wire grated floor because the weight of the dog would cause the wire to be pressed into the pads of her feet. He testified that as the dog starts to cut her feet on the wire, she could get an infection because she's walking on wire grate that is dirty from her defecation and urination. Cantrell also testified that the blue tarps did not provide necessary shelter; he believed the tarps only provided protection from the rain and would not protect Baby G or the puppies from an extreme temperature environment.

Appellant presented the testimony of three witness and testified in her defense. One witness was Chardonnay Arguijo, who appellant and Hudson paid to help take care of the dogs. Arguijo described appellant and Hudson as "very loving" and educated about dogs. She also had never seen anyone spend so much on their dogs. Arguijo testified she helped moved the kennels and dogs from appellant's rental property located in Fort Worth to the property in Royse City. She said she and Hudson started the moving process for the dogs on October 17. According to Arguijo, they first moved the large kennels and then started moving the dogs on October 18. Arguijo's last trip to the property was on October 19. She said that as of that day, Baby G had not yet been moved. She thinks Baby G remained at the Fort Worth property until the next day and that Baby G was kept in the whelping pen before she was moved. Appellant did not help move the dogs because she was not feeling well. Arguijo testified that when she and Hudson were at the property, they always made sure the dogs had clean water and fresh food.

Hudson testified he and appellant decided to move their animals (dogs and horses) to the Royse City property because they were having problems getting water out of the well on the property they leased in Fort Worth. He said they leased the Royse City property for the animals and he and appellant rented a house ten miles away. Hudson moved Baby G and twelve of the puppies on October 20. He testified that they were the last dogs moved because he wanted to minimize their stress, which he said can cause dogs not to eat because they are scared. During the moving process, Hudson left food and water each time he made a trip to the property. He brought two 50-pound bags of food and five or six 5-gallon jugs of water. He said he was at the property twice on October 20 and one time on October 21, the day before the seizure.

Hudson testified that months before the move, they thought they had found a home for Baby G. The home was with a guy named Armando, who owned a male pit bull. Hudson assumed Armando planned to breed his male with Baby G, but Hudson did not know for sure.

They gave Baby G to Armando under conditions that they could visit her. After the second visit, they decided the way Armando was keeping Baby G "didn't look right." For example, Armando was not feeding Baby G the food they recommended. So, they took her back in the middle of September. Hudson did not know that Baby G was pregnant at the time, but he knew she was pregnant when they started planning the move to the Royse City property. He did not know when the puppies were due.

Hudson testified that the placement of the crates and tarps among the twigs and sticks is a den-like environment he created. He explained he went to Animal Behavior College where he learned that dogs live in dens. The den he fashioned was a secured area where he hoped the dogs would feel safe from the elements and "other stuff that's in the area." Hudson testified that the whelping pen they chose to house Baby G was custom made and approved by their veterinarian. Hudson did not have any concerns about putting Baby G in that particular pen. He said she did not seem uncomfortable and at that point in the pregnancy, she was not moving around much. He explained that he put the logs on top of the crates to hold the tarp down, not to prevent Baby G was getting out of the crate.

Hudson testified that Baby G lost weight because of the stress from being moved twice. Hudson never deprived her of food and fed her "the healthiest foods" you can buy. He also said she was always given adequate water and he did not observe any skin conditions on her. Hudson could not tell whether the photograph of the bucket of water from Baby G's crate looked oily or was brown. He said he saw a reflection of the tarp in the water.

Hudson testified that he and appellant consulted their veterinarian, Mark Crabill, about issues with mange and worms. They purchased various de-worming medications and mange treatments from Crabill. Crabill testified that he saw the dogs for a variety of reasons, such as performing wellness checks on puppies and helping appellant take care of some skin issues with

the dogs. Crabill did not give appellant any advice on nutritional issues with the dogs. He estimated he saw twelve to sixteen of the dogs over the course of a four-year period. Crabill described appellant as a concerned pet owner who wanted to do what was best for her animals.

Crabill never examined Baby G. Looking at the same photographs Taylor testified to, Crabill agreed with Taylor's assessment that Baby G was underweight. But from the photographs, he could not say why she was underweight; he stated there could be "one of multiple factors going on there," including malnutrition. He believed the photographs show that Baby G was given some food, just not enough food. Crabill also testified that the stress involved with moving could affect a dog's eating habits.

Appellant testified she loved each of the dogs and would not do anything to harm their health. Appellant recalled she first went to the Royse City property on October 14 and 15 when she and Hudson moved their horses. But she did not return to the property until the afternoon of October 20. On that day, she spent an hour or two at the property during which time she gave the dogs food and water. She also said she brought food and water the next afternoon, October 21. Appellant planned to return with food and water in the afternoon on October 22. She agreed that she did not return to the property until after 5:00 on October 22. This was after Chavez called appellant about the dogs. Appellant conceded she was in Fort Worth when she received Chavez's call and was "nowhere near the property."

Appellant testified that Baby G was "very well taken care of" and did not have any skin or worm conditions. When Baby G first returned from living with Armando, it was "a little while before she started eating normally again." Appellant also knew that Baby G was pregnant. Appellant testified that when she left the property on October 21, Baby G had not yet given birth. Appellant said Baby G was in good health at the time and in a "sufficient place" to deliver her puppies. Appellant had no concerns about the whelping pen in which Baby G was placed. And

she confirmed that Baby G had been in the same pen while at the Fort Worth property. Appellant said Baby G "never had any problems with it" and would "go in and out on her own." Appellant testified she gave the dogs 100 pounds of food each day. She also testified that "necessary food" means "enough food to maintain good health" of the dogs. While appellant agreed that Baby G was thin, she disagreed that Baby G had not been given the necessary food. Appellant further said she understood the definition of necessary water. She agreed that the water bucket from Baby G's crate looked oily and that it was not fresh water.

*Analysis*

Appellant claims that Taylor's testimony negated the elements the State was required to prove because Taylor testified that "Baby G showed no signs of dehydration, and that any evidence of malnutrition was in all likelihood due to her pregnancy, not due to neglect." She specifically relies on Taylor's testimony that the added nutritional requirements from Baby G's pregnancy "could have brought her to this condition" and his notes from his examination of Baby G in which he wrote that Baby G was "very thin due to pregnancy, lactation." She also asserts that an important consideration is the fact that Baby G was the last dog brought to the Royse City property and she had been there only forty-eight hours before Wyda called the Sheriff's office. She maintains that no qualified veterinary sciences expert testified that Baby G was not provided the necessary food in those forty-eight hours and "none of the other adult dogs showed signs of malnourishment."

Although Taylor testified that Baby G had additional nutritional requirements related to her pregnancy and lactation, he only stated that these requirements "could have" brought her to this condition. Taylor explained that he would expect a pregnant or nursing dog to have her diet supplemented or increased and with adequate nutrition, such a dog should not be this thin. Taylor also testified that Baby G was "obviously underweight" and "undernourished" and in

"poor" condition. Crabill agreed that Baby G was underweight but he could not state why she was underweight. He testified that based on the photographs he saw of Baby G at the shelter, he believed Baby G was not given enough food. He also said that there could be "multiple factors" leading to Baby G's condition, including malnutrition.

The trial court also heard testimony that at the stage Baby G was in her pregnancy, she should be fed a minimum of once a day. Both Hudson and appellant testified that they gave the dogs food and water each day leading up to the seizure of the dogs on October 22. But Baby G's poor physical condition as testified to by Taylor, Chavez, Earles, and Ross and the photographs of Baby G at the animal shelter coupled with Wyda's testimony that she had not seen anybody come to the property in a few days contradict this testimony, and we must defer to the fact finder's resolution of conflicts in the evidence. *See Jackson* 443 U.S. at 326. Cantrell also testified that Baby G's physical condition as shown in the photographs indicated that she had been subjected to long-term "lack of adequate food," and he estimated she had not been fed appropriately for a month to six weeks. The evidence also showed that when the deputies and animal control arrived at the property, none of the dogs had any food, and the water provided was not fresh, healthful water. Appellant testified that she had planned to come back to the property in the afternoon on October 22. But she did not show up until after 5:00 in the afternoon that day and only after Chavez called her. She conceded she was nowhere near the property when she received Chavez's call.

Appellant knew that Baby G was pregnant before she was moved to the Royse City property. Appellant also knew that Baby G had some weight loss after moving back to their home in mid-September 2011. Yet in caring for Baby G during the period when she had additional nutritional requirements and noted stress from a prior move, appellant left Baby G alone to deliver her puppies on property in which she was found with no food and only oily,

stagnant, not healthful water.  *Cf. Martinez v. State*, 48 S.W.3d 273, 276 (Tex. App.—San Antonio 2001, pet. ref'd) (stating that fact finder could infer culpable mental state from circumstances surrounding the offense).  Viewing all the evidence in the light most favorable to the verdict, including reasonable inferences, a rational fact finder could have found appellant failed unreasonably to provide necessary food, water, care, or shelter to Baby G to maintain her in good health.  *Jackson*, 443 U.S. at 318–19; *see also* TEX. PENAL CODE ANN. § 42.092(b)(3).  We therefore conclude that the evidence is legally sufficient to support appellant's conviction for cruelty to animals.  We overrule appellant's second issue.

Having overruled appellant's issues, we affirm the trial court's judgment.


_/Ada Brown/_____
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
130578F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MONIQUE DANAE MCCLINTON,
Appellant

No. 05-13-00578-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law,
Rockwall County, Texas
Trial Court Cause No. CR11-1799.
Opinion delivered by Justice Brown.
Justices Bridges and O'Neill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 3, 2014