

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0916-11

---

### RYAN RASHAD MERRITT, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### FORT BEND COUNTY

---

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, WOMACK, JOHNSON, KEASLER and COCHRAN, JJ., joined. ALCALA, J., not participating.

### O P I N I O N

A jury found Appellant, Ryan Rashad Merritt, guilty of arson for the burning of an insured and mortgaged vehicle. The trial court assessed his punishment at confinement for ten years and one day. The First Court of Appeals reversed, determining that the evidence was insufficient to support a conviction. *Merritt v. State*, 2011 Tex. App. LEXIS 1763 (Tex. App.—Houston [1st Dist.] Mar. 20, 2011) (mem. op., not designated

for publication). We exercised our discretionary review, and we will reverse the court of appeals and affirm the trial court's judgment.

## I. FACTS[1]

On December 17, 2006, Appellant's SUV, a 2006 GMC Yukon Denali, was found abandoned in a field with fire damage to its interior. After an investigation, Appellant was indicted for the offense of arson for the burning of an insured and mortgaged vehicle. TEX. PENAL CODE § 28.02(a)(2)(B), (C).[2] Specifically, Paragraph A of the indictment alleged that Appellant did "start a fire with intent to damage or destroy a vehicle owned

---

[1]The trial testimony is repetitive. However, Appellant gave three different statements, and a discussion of each is necessary when considering the entire record.

[2]The Texas Penal Code provides,
(a) A person commits an offense if the person starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage:
    (1) any vegetation, fence, or structure on open-space land; or
    (2) any building, habitation, or vehicle:
        (A) knowing that it is within the limits of an incorporated city or town;
        (B) knowing that it is insured against damage or destruction;
        (C) knowing that it is subject to a mortgage or other security interest;
        (D) knowing that it is located on property belonging to another;
        (E) knowing that it has located within it property belonging to another; or
        (F) when the person is reckless about whether the burning or explosion will endanger the life of some individual or the safety of the property of another.
TEX. PENAL CODE § 28.02(a).

by Defendant and/or David Ross, knowing that it was insured against damage or destruction," and Paragraph B alleged that Appellant did "start a fire with intent to damage or destroy a vehicle owned by Defendant and/or David Ross, knowing that it was subject to a mortgage or other security interest."

At trial, Matt Cornell, an investigator with the Fort Bend Fire Marshall's Office, testified that he was dispatched to investigate an abandoned vehicle on December 17, 2006. A homeowner had discovered the GMC Yukon Denali and, finding that it was burned inside, contacted the police. Cornell testified that the vehicle's exterior looked to be in good condition. The only indication of a fire was that the windows were darker than normal. There was damage to the driver's side door, which Cornell testified seemed to be "attempted forcible entry." However, "[i]t appeared to actually be more hammered in than pried on," and the opening was not large enough to allow a tool to get in to lift the lock. Cornell also noted that, although the vehicle's wheels were in place, some lug nuts were missing. He saw no markings where something had been laid underneath the vehicle; nor did he see any tire tracks in front of or behind the SUV or other evidence suggesting a wrecker may have been used to place the vehicle there. He did find three unburned, wooden matches on the ground near the SUV, however.

Inside the vehicle, Cornell discovered three separate burned areas that were not contiguous, thus indicating three separate points of origin. At each point, he found remnants of fine, newspaper-like paper, and he explained that the fire did not spread more

because the windows were rolled up, causing the fire to run out of oxygen. Cornell found

no damage to the steering column, and the ignition was intact. He also noted that the

seats, door panels, glove box, radios, and electronics had been removed. However, there

was a "lot of value" remaining with the vehicle, including the tires, headlights, lights,

dash, hood, and doors. Cornell explained that this is not common on "burned stolens"

—"[i]t would be very common to find to [sic] this deal either on cinder blocks or on the

spare-tire doughnuts." Cornell opined that the fire was incendiary in nature because he

was able to exclude other causes (*i.e.*, accidental or mechanical causes), there were three

points of origin (a "red flag"), and the wheels' lug nuts were missing. Although he was

unable to determine what was used to ignite the paper, Cornell believed that the fire was

started by someone who had ignited the paper products found in the SUV.

Subsequently, Cornell discovered that the SUV had been reported as stolen, and he

contacted the Houston Auto Theft Task Force. He then contacted Appellant, the

registered owner, and on January 25, Appellant gave a statement. In that statement,

Appellant indicated that he had last seen his SUV on December 16 at around 6:30 p.m.

outside of Floyd Houston's apartment. That evening, Appellant had gone over to

Houston's apartment, and the two men "hung out" before driving Houston's car to a

couple of clubs.[3] They stayed out all night, sitting in the club parking lots while drinking

---

[3]Cornell testified that there were some timing inconsistencies in Appellant's statement:
[I]n the first part of the paragraph, he sat around his house drinking for four or
five hours, "Then we decided to take off riding at about 10:30." Then in the
statement further down in the paragraph here, it stated that "We had stopped at a

and watching people. Returning to Houston's apartment around 5:00 a.m. the next morning, Appellant discovered that his car was missing. Appellant stated that he did not notice any broken glass in the area where his car had been and that he had both sets of the SUV's keys at that time. However, Appellant explained that, a month prior, he had taken his SUV to a car wash, and his keys were temporarily missing. An individual not associated with the business produced the keys three or four hours after the car was washed. Appellant stated that he did not contact the police regarding this occurrence. Also during the statement, Appellant asserted that he does not use wooden matches because his apartment did not have gas; that his tractor-trailer was stolen six months prior to the incident at issue; and that the second person on the SUV's registration was David Ross, a friend he had met at the mall but with whom he had not spoken in some time.

Cornell further testified that he went to Appellant's apartment complex after obtaining Appellant's statement. The manager informed him that Appellant had had a separate lease on a garage, but he had ended that lease when the SUV was stolen. The manager allowed Cornell to go into the garage, where he found several bags of what appeared to be trash. Inside the bags, he observed a Cartronix envelope,[4] the dealer window stickers for the SUV, various receipts, and other items that he "believed to be the contents of the glove box or the inner console" of the SUV.

---

liquor store on Westheimer around 6:00" -- "a liquor store at Westheimer and Highway 6 around 7:30 or 8:00" . . . .

[4]Appellant purchased tires and rims for his SUV from Cartronix. *See infra.*

David Thornsen, a member of the Special Investigations Unit of Allstate Insurance, investigated Appellant's insurance claim for potential fraud. He stated that the estimated total value of the claim was $41,682—$37,182 for the vehicle and $4,500 for the tires and wheels. Thornsen explained that, under the conditions of the insurance policy, an insured agrees to submit to an examination under oath to be recorded by a court reporter. Consequently, on January 2, 2007, he obtained a recorded statement from Appellant. The statement was read into the record. Appellant stated that he had last seen the car on Saturday, December 16. He had parked the SUV at Houston's apartment and locked the doors and windows. Two to three hours later, around 8:30 or 9:00 p.m, the two men left in Houston's car. They stayed out all night, sitting in Houston's car outside of bars. Appellant stated that he did not use any credit cards or make any calls during that time. The men returned to Houston's apartment at 5:30 or 6:00 a.m. and realized that the SUV was no longer there. Appellant did not see any broken glass in the area, and he did not believe it was towed because it had been parked legally in one of Houston's parking spots. At 6:00 or 6:30 a.m., he called the police and reported the SUV missing. He then returned home and watched television. Appellant stated that he had not yet informed his wife about the SUV. Responding to Thornsen's questions, Appellant informed Thornsen that about two weeks after purchasing the SUV, he had paid "close to $5,000" for new rims and tires. And he asserted that he had not been arrested or convicted, filed personal bankruptcy, been subject to a home foreclosure or vehicle repossession, or been sued, and

that he did not owe any money currently in collection.

After the recording ended, Appellant decided "in casual conversation" to provide additional information, so Thornsen documented a supplemental recorded statement. In that, Appellant explained that roughly two months prior to the statement, he went to a car wash, and when the wash was finished, the keys were missing. Five hours later a man showed up with the keys. Thornson testified that he had asked several questions about the keys because "the biggest thing in any vehicle theft is . . . to follow the keys." He explained, "if he has both keys . . . , the vehicle is stolen, and all of a sudden the vehicle shows up, and there's no steering column breach or no ignition breach, that means they had to have a key to drive the vehicle. The person has both keys, there's a problem with that."

Thornsen further testified that he inspected the SUV. He noted that the interior had been burned, but the steering column, dash, and ignition area appeared to be undamaged. Thornsen also noted that the seats, radio, and driver's mirror had been removed. Thornsen followed up with an expert, who informed him that "[t]he bottom line is the ignition and the steering column [were] not compromised. You had to use a key to drive the vehicle." On the exterior, Thornsen noticed there were signs of forced entry on door, but he could not tell if entry was accomplished. Also, some lug nuts were missing from the wheels, and a different set of rims and tires appeared to be on the vehicle. Thornsen commented that the wheels and tires were about 15 inches, much

smaller than the 24-inch versions purchased by Appellant. Thorsen opined that "it was pre-planned" to get four matching tires and rims that fit the SUV.

Thornsen also requested that Appellant complete an "Affidavit of Vehicle Theft." He explained that the affidavit is compared with the recorded statement, the examination under oath, and the physical evidence to determine if there are any inconsistencies. Comparing, Thornsen found several such inconsistencies. For example, Appellant indicated that he had not experienced a vehicle theft before. However, he had filed four previous claims. These included two prior Allstate claims (one for the January 1999 theft of a 1994 Acura Legend and one for the October 1999 theft of a 1999 Jeep Grand Cherokee), a State Farm claim for the March 2003 theft of a 2002 GMC Yukon, and a Great American Insurance claim for the May 2005 theft of a 1997 Freightliner. Other inconsistencies noted by Thornsen included the time when Appellant had last seen the SUV, the price of the rims and tires and manner of payment, the events surrounding the missing keys at the carwash, Appellant's statement that he had made a $6,000 down payment when he had made no down payment, his statement that the receipts for the rims and tires were in the SUV when they were found in his garage, and his explanation of how he knew David Ross (the second person on the SUV's registration). Thornsen also opined that Appellant's actions were not "typical" because he did not call OnStar, nor did he tell his wife about the theft.[5]

---

[5]Thornsen also complained of Appellant's initial "non-cooperation" when he did not provide all of the requested documents.

Ofelia Stevens, a certified court reporter, testified that on May 9, 2007, she recorded an examination under oath of Appellant in reference to his insurance claim. The statement was read into the record. A lawyer representing Allstate Fire and Casualty Insurance and David Thornsen were present at the examination. Appellant stated that he never possessed a copy of the Yukon's title, and he had not brought documentation with him to prove that he had purchased the car. He claimed that he had left the contracts and receipts in the SUV. Still, Appellant explained how he had obtained financing for the vehicle. After meeting David Ross at a mall in 2002, Appellant would call Ross occasionally to talk about sports and trucks. Then, in a 2006 conversation, Appellant informed Ross that he was thinking about purchasing a new vehicle and that he may need a co-signer. Ross offered to co-sign on the loan, and he later did so. Appellant explained that the men went to the dealership on different days to complete the paperwork. Appellant further stated that he made a $6,000 down payment, and he agreed to make monthly payments of $996, of which he made seven. Appellant later purchased 24-inch rims and tires worth $4,500 from Cartronix, but he traded in his old rims to receive a discount.

Continuing the examination under oath, Appellant asserted that he had two sets of keys, and he explained that one set was temporarily lost at a car wash a month before the theft. (The second set of keys was in a drawer at his home.) After his SUV was cleaned, the keys could not be located. Appellant stated, in this version of the facts, that the police

were notified of the situation; however, about two hours after their disappearance (and before the police arrived), an unnamed individual drove up in a vehicle and returned the keys. Appellant did not ask questions, and there was no indication that he filed an official report with the police.[6]

Regarding the events of December 16, Appellant stated that he went to Houston's apartment around 4:30 or 5:30 p.m. They left at 7:30 or 8:00 p.m. in Houston's car, and at 9:00 p.m., they sat in the parking lot of a club. Then around 12:30 or 1:30 a.m., the men went to an after-hours club where they again sat in the parking lot. Appellant explained that when they returned to Houston's apartment at 5:30 a.m., he noticed that the SUV was not parked where it had been previously. The parking spot was occupied by another vehicle. He did not see any glass on the ground. After calling a number to confirm that the SUV had not been towed, Appellant contacted the police department to report it missing. Houston dropped Appellant off at home around 6:30 a.m. An hour or two later, the Houston Police Department informed Appellant that his SUV had been recovered. Appellant stated that when he "eventually" went to pick up the SUV, he noticed that the rims and tires were not the same as those that had previously been on his car and that the windows were tinted from the smoke. He also noted that the stereo, iPod, CDs, DVDs, seats, and door panels had all been removed. Appellant asserted that he did not tell his wife that his SUV had been stolen until about a month after the theft, and

---

[6]Appellant also complained that someone had been breaking into his commercial vehicle. He stated that he had reported the instances to the police, and he thinks he is "a target."

during that month, his wife never asked where the car was, even when Appellant drove a rental car for some time.

During the examination under oath, there was also some discussion of Appellant's December 16 call records. In addition to calls to his home and Houston, he called LaTonya Knotts three times, including a twenty-minute conversation that occurred shortly before he went out for that evening. Additionally, the examination addressed Appellant's past financial issues, which were often related to his vehicles. In 2000, he purchased a Ford Expedition in his name and then gave it to his friend Knotts. He does not know what happened to that car, but he was sued by Ford Motor Credit because he did not pay off the car. Also, he filed bankruptcy in 2003 after his 18-wheeler was stolen. Due to mistakes in the paperwork, he had to re-file for bankruptcy in 2005.

David Ross testified that around Thanksgiving of 2006, he received phone calls from a creditor who informed him that he was behind on payments due for tires purchased in Houston. Ross explained that he had visited Houston for an interview in 2005, but he had not been to a tire store while there. Upon obtaining a copy of his credit report, he discovered that the purchases of the tires, as well as a GMC Yukon Denali, had occurred without his authorization, and he informed creditors of such. Ross also obtained copies of the purchase documentation for the tires and the SUV. The documents contained his personal information and were signed with the name "David Ross." However, Ross testified that the signature was not his and that he did not authorize anyone to sign his

name. Ross also stated that he had never met Appellant. Ross filed a police report regarding the identity theft, but he was not aware of any criminal charges being filed.

Carlos Mesa, the President of Cartronix, testified that on March 27, 2006, his business sold 24-inch tires and rims to Appellant for a GMC Yukon Denali for $3,078. Mesa explained that Appellant financed part of the purchase, which required him to complete an application to determine whether he qualified for financing. During that process, a drivers license and social security number for "David Ross" were presented. Mesa additionally testified regarding his general knowledge of Denali security features. He explained that 2006 and 2007 Denali keys contain a computer chip, and replacement keys must be obtained at the dealership. If the keys are copied in another manner, the copy might unlock the doors of the SUV, but it could not start the engine. Also, if the steering column is intact, to move the SUV from one location to another, one must either use a key to drive it or have it towed.

Mike Nguyen, a finance manager at Gay Pontiac, testified that in March 2006, he reviewed and approved financing for the 2006 GMC Yukon Denali, which sold for a total purchase price of $49,218.39. Nguyen stated that two individuals signed the loan, David Ross and Ryan Merritt. "David Ross" visited the dealership to sign the necessary purchase papers, and he represented himself as Appellant's father. Nguyen asserted that the David Ross who had testified earlier in the trial was not the "David Ross" present on the day of the financing.

Chris Walker, a salesman at Gay Pontiac, testified that he was involved in the sale of the 2006 Denali. Walker stated that David Ross, claiming to be Appellant's father, called about the purchase of the SUV, and he obtained Ross's credit information over the telephone. Ross later came to the dealership to sign the paperwork, and then, a week and a half later, Walker met with Appellant at a fast-food restaurant to complete the paperwork. Walker further testified that Denali keys are equipped with a chip or theft-determining system. To obtain a new fully functioning key, one must initially receive approval from General Motors by supplying a copy of his social-security card and driver's license; then a key code can be released to the service department to cut a key. Still, the key only works after it has been put on a Tech 2 machine for proper programming.

Lana Reinecker, a manager at the Richmond branch of Wells Fargo Bank, testified that the bank made a $49,015.57 auto loan in Appellant's name. Reinecker stated that the vehicle was purchased with no down payment. She asserted that, by December 17, 2006, Appellant had made seven payments of $994.96 on the loan, but he was two payments behind, owing nearly $2,000 in arrears (in addition to the remaining balance of the purchase price). Reinecker explained that, when a vehicle has a lien on it, it should have full coverage insurance, so if it is burned, the insurance company would pay to the bank the balance of the policy, thus taking care of the obligation of the person who took the loan. However, when there is an arson investigation, as in this case, no payment is made by the insurance company until it completes its own investigation. Consequently, Wells

Fargo had written off the loan as a loss of $32,671.50.

The jury found Appellant guilty of the offense of arson for the burning an insured mortgaged vehicle, and the trial court assessed punishment at ten years and one day's confinement.

## II. FIRST COURT OF APPEALS

On direct appeal, the First District Court of Appeals reversed the judgment of the trial court, holding that the evidence was legally insufficient to support Appellant's conviction.[7] *Merritt*, 2011 Tex. App. LEXIS 1763, at *25-26. The court noted that Appellant did not challenge the fact that the fire was incendiary in nature, so the issue was "whether the State presented evidence establishing appellant's identity as the person who started the fire." *Id*. at *21. After considering the record, it concluded that "there is simply no evidence that appellant was the person responsible for setting his SUV on fire." *Id*. at *24.

In its analysis, the court reasoned that, although evidence of motive was presented and motive is a relevant factor, it is not sufficient to show that Appellant committed the offense. Further, the court determined that there was no evidence that Appellant was ever present at the scene or any other evidence indicative of guilt. *Cf. Orr v. State*, 306

---

[7]Because the court of appeals sustained Appellant's first issue, it did not address his other claims that the evidence was factually insufficient to support his conviction, the trial court erred in admitting evidence of extraneous offenses during the guilt phase, and the cumulative effect of the trial court's errors deprived him of a fair trial. *Merritt*, 2011 Tex. App. LEXIS 1763, at *1, *25.

S.W.3d 380, 394 (Tex. App.—Fort Worth 2010, no pet.) (holding the evidence sufficient to support appellant's conviction for arson when she had a motive, was present at the time of the fire, and gave implausible explanations about the fire); *Krebsbach v. State*, 962 S.W.2d 728, 734 (Tex. App.—Amarillo 1998, pet. ref'd) (determining that the appellant's motive to set the fire, presence in the home just as the fire began, and inconsistent statements as to how she discovered the fire sufficed as proof that she set the blaze). The court considered the pieces of evidence relied on by the State separately and rejected each. For example, the court observed that trash bags found in Appellant's garage contained items commonly found in a vehicle's glove box, but then decided that a reasonable inference that Appellant committed arson could not be drawn from that fact. *Merritt*, 2011 Tex. App. LEXIS 1763, at *21-22. Similarly, the court noted that matches were found at the scene, but it believed nothing in the record linked the matches to Appellant's possession. *Id.* at *22-23. Finally, the court recognized that Appellant was in possession of both sets of keys to the SUV at the time that it was allegedly stolen, but it discounted that fact because "although there is no evidence that the car was towed to the location by a wrecker, . . . there is also no evidence that the car was not towed to the location by a wrecker." *Id.* at *23-24.

Therefore, the court of appeals held that, viewing the evidence in the light most favorable to the prosecution, "a rational trier of fact could not have found beyond a reasonable doubt that appellant committed or was complicit in committing the offense of

arson." *Id.* at *25.

We granted the State's petition for discretionary review to consider the court of appeals's analysis and whether it correctly decided that the evidence was insufficient to support Appellant's conviction. Specially, we granted review on the following grounds:

> (1) To establish identity in an arson case, must motive be combined with some other circumstance(s) or should the reviewing court simply consider the logical force of the evidence on a case by case basis?
> (2) Did the First Court ignore evidence that supported the jury's verdict?
> (3) Did the First Court's analysis disregard the jury's prerogative to draw reasonable inferences and resolve conflicting theories of the case, in turn resurrecting the alternative reasonable hypothesis construct?

### III. ARGUMENTS OF THE PARTIES

#### A. State's Argument

The State argues that the court of appeals's opinion should be reversed because a full review of the record reveals that the circumstantial evidence connecting Appellant to the fire was legally sufficient. According to the State, the analysis of the court of appeals violated "established rules of sufficiency review by ignoring significant relevant evidence, refusing to credit the jury's reasonable inferences from the evidence, and requiring the State to disprove alternative reasonable hypotheses."

The State contends that facts omitted or ignored by the court of appeals collectively support Appellant's conviction by connecting him to the fire through motive and presence. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007). The State asserts that Appellant's financial problems supplied a motive for the arson, and an

insurance payout would have satisfied his most recent obligations regarding the SUV and would have alleviated his overall financial burden. Further, the State argues that the evidence supports Appellant's presence at the scene. According to the State, the SUV was either driven to the location where it was found or it was towed. From this evidence, the State infers there is no rational explanation for the towing of the SUV, removal of the rims and tires, and replacement of the rims and tires with a cheaper set before setting the vehicle on fire other than that Appellant did these acts for financial reasons. Additionally, the State avers that the condition of the door latch indicates that only someone with keys could have entered the SUV to strip the interior and set fire to the passenger compartment. The State argues that the keys would have enabled both entry and driveability, and the fact that Appellant possessed both of the original sets of keys supports the inference that Appellant drove the SUV to the field and set it on fire. Accordingly, the State believes that the jury's ultimate conclusion of guilt was rational and easy.

Finally, the State asserts that, by focusing on the lack of evidence that the SUV was *not* towed, instead of considering whether the jury could have found that the SUV was driven to the scene, the court of appeals improperly served as the thirteenth juror in choosing between conflicting theories of the case and has focused on what is not in evidence, rather than what is. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

### B. *Appellant's Argument*

Appellant responds that, although the State established motive and arson, it failed to establish identity (*i.e.*, that Appellant set the SUV on fire). Appellant argues that motive alone is not sufficient to prove the identity of an arsonist. He asserts that there was no evidence, direct or circumstantial, placing him at the scene of the arson or proving he set or directed anyone to set fire to his mortgaged vehicle.

### IV. ANALYSIS

The only issue with which we are presented today is one of identity. A person commits arson by starting a fire or causing an explosion "with intent to destroy or damage" under specified circumstances, which include "knowing that it is insured against damage or destruction" or "knowing that it is subject to a mortgage or other security interest." TEX. PENAL CODE § 28.02(a)(2)(B), (C). Thus, to sustain an arson conviction, the State must show, in addition to the other elements, that the accused set the fire or was "criminally connected therewith." *Bussey v. State*, 474 S.W.2d 708, 710 (Tex. Crim. App. 1972); *see Taylor v. State*, 735 S.W.2d 930, 941-42 (Tex. App.—Dallas 1987, no pet.).

It is the State's burden to prove each element of the offense beyond a reasonable doubt, not to exclude every conceivable alternative to a defendant's guilt. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993) (explaining that "the evidence is not rendered insufficient simply because appellant presented a different version of the events"). A

criminal conviction may be based upon circumstantial evidence. *Clayton*, 235 S.W.3d at 778; *Miller v. State*, 566 S.W.2d 614, 617 (Tex. Crim. App. 1978). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Clayton*, 235 S.W.3d at 778.

When reviewing the sufficiency of the evidence,[8] we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Adames v. State*, 353 S.W.3d 854, 859-60 (Tex. Crim. App. 2011); *Brooks*, 323 S.W.3d at 912. The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. We permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Id.*; *see Hooper*, 214 S.W.3d at 16-17 (stating that "courts of appeals should . . . determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict"). The jury is not

---

[8]Although the court of appeals reviewed the legal sufficiency of the evidence, we held in *Brooks* that there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard, and these two standards have become indistinguishable." *Brooks*, 323 S.W.3d at 902. Therefore, "[t]he *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* at 912.

permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 16. When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326.

After a thorough review of the record and the opinion below, we hold that the court of appeals incorrectly applied the *Jackson* standard when considering the circumstantial evidence supporting Appellant's conviction. The court failed to properly consider the combined and cumulative force of the evidence and to view the evidence in the light most favorable to the jury's guilty verdict. *See Hooper*, 214 S.W.3d at 16-17. The court did not consider all of the evidence, and in conducting its review of the evidence, the court improperly used a "divide-and-conquer" approach, separating each piece of evidence offered to support Appellant's conviction, followed by speculation on the evidence State did not present. *See Clayton*, 235 S.W.3d at 778-79; *see also Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). The court's approach is incorrect under our case law requiring reviewing courts to consider the combined force of all of the evidence. *Smith*, 332 S.W.3d at 442. Giving proper deference to the jury's verdict, we find the evidence sufficient to sustain Appellant's conviction.

Although motive and opportunity are not elements of arson and are not sufficient to prove identity, they are circumstances indicative of guilt. *Clayton*, 235 S.W.3d at 781;

*Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Harris v. State*, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987). Appellant concedes that the State presented evidence of motive. *Guevara*, 152 S.W.3d at 50 ("Motive is a significant circumstance indicating guilt. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.").[9] The record shows that Appellant had financial problems, including a personal bankruptcy and an outstanding judgment of $35,000 based on a loan given for his purchase of a 2000 Ford automobile and his subsequent failure to repay the loan. He also owed a substantial amount of money on the burned SUV and the rims and tires removed from the burned vehicle.

Evidence also supported Appellant's opportunity to commit the crime. Appellant was in possession of both sets of keys at the time of the alleged theft. Keys would logically allow entry into the SUV to drive it away. The jury also heard testimony that when the ignition and steering column are intact, as was the case here, the SUV can be moved only by someone using a key to drive it or by a wrecker towing it. Thus it is rational that the suspects were Appellant, the person with "new keys," or a tow-truck driver. Appellant suggested that an individual from the car wash took the keys to make a copy, but there was ample testimony about the difficulty of obtaining a fully functioning copy of a 2006 Denali key. Finally, the jury could rationally conclude that, because there were no marks indicating a wrecker's presence at the scene, a tow-truck was not involved

---

[9]"While motive is the inducement to do some act, intent is the mental resolution or determination to do it." BLACK'S LAW DICTIONARY 813 (7th ed. 1999).

and that Appellant drove the SUV there.

Testimony was provided that the tires and rims purchased at Cartronix for the SUV had been replaced with four much smaller, cheaper tires, and that obtaining these four matching tires would involve pre-planning. The jury also heard testimony that this scenario is inconsistent with the normal vehicle-theft case in which the vehicle is often found without tires and propped up on stilts or cinder blocks. As the State argues, tires would allow the SUV to be mobile and challenges a theory that the SUV had been towed.

Further, testimony revealed that the door was damaged, but the attempted entry was not successful because the space pried open was not large enough to allow access to the locking mechanism. Yet, interior items had been removed before the fire was set inside the SUV. In addition, the jury heard testimony that the items found in the trash of Appellant's garage are apparently documents typically kept in a vehicle's console or glove box. Appellant asserted however in his sworn statement that he did not have those documents because he left them in the SUV.

Appellant's recollection of his activities on the evening of December 16, a period of approximately twelve hours, was contradicted by other evidence. No credit-card receipts or other documents from that night were provided, and no witness was presented to corroborate Appellant's story. Additionally, the timelines Appellant gave to Cornell, Stevens, and Thornsen were inconsistent. And testimony showed that Appellant did not call OnStar, even though the SUV was equipped with the technology to promptly locate

the vehicle; instead, it took several hours to locate the vehicle. Finally, and of crucial importance was the testimony that this was the fifth time that Appellant had reported a stolen car.

Having viewed in the light most favorable to the verdict, we hold that the evidence is sufficient to support Appellant's conviction. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 16-17. We are not the fact finder, and neither was the court of appeals. *Wirth v. State*, No. PD-1054-11, 2012 Tex. Crim. App. LEXIS 480, at *10 (Tex. Crim. App. March 21, 2012) (citing *Cavazos v. State*, 132 S. Ct. 2, 4 (2011)). The verdict reflects that the jury inferred from the circumstantial evidence that Appellant was guilty of arson for the burning of his SUV. "This was not a determination so outrageous that no rational trier of fact could agree." *Id.*[10] The court of appeals incorrectly applied the *Jackson* standard when considering the circumstantial evidence supporting Appellant's conviction, and improperly employed a "divide-and-conquer" approach. *Smith*, 332 S.W.3d at 442; *Clayton*, 235 S.W.3d at 778-79. Further, it improperly acted as a thirteenth juror when it speculated and focused on the existence of a reasonable hypothesis inconsistent with the guilt of the accused, thereby repudiating the jury's

---

[10]"Because rational people can sometimes disagree, the inevitable consequence of this settled law [that a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury] is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos*, 132 S. Ct. at 4.; *Wirth*, 2012 Tex. Crim. App. LEXIS 480, at *10 n.21.

prerogative to weigh the evidence, to judge the credibility of the witnesses, and to choose between conflicting theories of the case. *Laster v. State*, 275 S.W.3d 512, 520-21, 522-23 (Tex. Crim. App. 2009) (reiterating the rejection of the outstanding reasonable hypothesis analytical construct); *see Brooks*, 323 S.W.3d at 911-12 (stating that direct-appeal courts are not permitted to act as the "thirteenth juror").

Therefore, we defer to the jury's determination and hold that the evidence presented is sufficient to support Appellant's conviction.

## V. CONCLUSION

We hold that the court of appeals erred in holding that the evidence was insufficient to support Appellant's conviction for arson. Accordingly, we reverse the judgment of the court of appeals and remand this case so the court can consider Appellant's other claims.[11]

Hervey, J.

Delivered: April 18, 2012

Publish

---

[11]On remand and in light of *Brooks*, 323 S.W.3d 893, the court of appeals need not address Appellant's factual-sufficiency claim.