

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00382-CR

Rene **ESCALANTE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 452nd Judicial District Court, Edwards County, Texas
Trial Court No. 1679
The Honorable Robert Hoffman, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  June 10, 2015

AFFIRMED

A jury convicted Rene Escalante of arson. On appeal, Escalante argues the evidence was insufficient to support his conviction because the State failed to prove beyond a reasonable doubt that the fire was deliberately set and that he set the fire. We affirm.

## BACKGROUND

At approximately 11:30 p.m. on September 5, 2013, Edwards County sheriff deputies were dispatched to the scene of a fire at a house located at 306 South College Street in Rocksprings, Texas. The inhabitants of the house, who were at home when the fire started, were able to escape

unharmed. The first deputy to arrive at the scene noticed that the fire was coming from a storage shed at the back of the house. Firefighters soon arrived and extinguished the fire.

The sheriff's deputies talked to witnesses at the scene and began an investigation into the cause of the fire. The next morning, a deputy state fire marshal examined the site where the fire took place and concluded that the fire had been deliberately set. Escalante was subsequently indicted for arson, and pled not guilty. The case was tried to a jury, which found Escalante guilty as charged in the indictment. Escalante appealed.

## STANDARD OF REVIEW

In a challenge to the sufficiency of the evidence, we review all of the evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). "It is the State's burden to prove each element of the offense beyond a reasonable doubt, not to exclude every conceivable alternative to a defendant's guilt." *Merritt*, 368 S.W.3d at 525.

In reviewing the sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* As the reviewing court, we give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 318-19; *Hooper*, 214 S.W.3d at 13. We determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*

*v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In evaluating the legal sufficiency of the evidence, we consider all of the evidence that sustains the conviction, whether properly or improperly admitted and whether introduced by the prosecution or the defense. *Simpson v. State*, 227 S.W.3d 855, 861 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001)).

A criminal conviction may be based upon either direct or circumstantial evidence. *See Merritt*, 368 S.W.3d at 525. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*; *Hooper*, 214 S.W.3d at 13.

### CHALLENGED ELEMENTS OF ARSON

A person commits the offense of arson if the person "starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage any building, habitation, or vehicle knowing that it is within the limits of an incorporated city or town." TEX. PENAL CODE ANN. § 28.02(a)(2)(A) (West 2011). Thus, to establish the crime of arson, one of the elements that the State must prove is that someone "designedly" set the fire. *See Adrian v. State*, 587 S.W.2d 733, 735 (Tex. Crim. App. 1979). "The essential element of the crime of arson is the willful burning of the building, without which that crime has not been committed." *Massey v. State*, 226 S.W.2d 856, 859 (Tex. Crim. App. 1950). Mere proof that the building burned is not sufficient. *Id.* "There must be some testimony showing that the fire was of incendiary origin—that is, that someone willfully burned the building." *Id.*

The State also must prove that the accused set the fire or was criminally connected to the setting of the fire. *Merritt*, 368 S.W.3d at 525. The latter element is sometimes referred to as "identity." *See id.* at 524-25 "There must be some proof, direct or circumstantial, showing the willful burning of the building by [someone] and the criminal connection of the accused

therewith.…" *Massey*, 226 S.W.2d at 859. Although motive and opportunity are not elements of arson, they are circumstances indicative of guilt. *Merritt*, 368 S.W.3d at 526.

**FIRE DELIBERATELY SET**

In this case, Escalante challenges the sufficiency of the evidence as to two elements of arson: (1) that the fire was deliberately set, and (2) that he was the person who set the fire.[1] We first examine the record for evidence that the fire was deliberately set. The only witness to testify on this issue was Greg Houston, a deputy state fire marshal. Houston testified that he was dispatched to Rocksprings on the morning of September 6, 2013, to conduct an origin and cause investigation for the fire that occurred at 306 South College Street. The purpose of an origin and cause investigation is to determine what caused the fire and how it was caused. Arriving on scene at about 9:30 a.m., Houston saw crime scene tape surrounding the property. The structure on the property was a blue house with an affixed storage room at its northeast corner. The house had a handicap access ramp leading to the back door. Fire debris was visible. Houston also noticed a lawn chair by the fence at the rear of the property.

Houston began by conducting a scene examination, which is a systematic procedure he uses in all his investigations. Houston begins his scene examination by examining the property around the burned structures for burn pits, burn barrels, campfires, or other similar items. He then proceeds to the interior of the burned structures to examine them. As Houston conducts his scene examination, he looks for competent ignition sources. Houston explained that there are some

---

[1]In support of his argument, Escalante cites two cases in which the Texas Court of Criminal Appeals found the evidence legally insufficient to support an arson conviction. *See Baugh v. State*, 776 S.W.2d 583 (Tex. Crim. App. 1989); *O'Keefe v. State*, 687 S.W.2d 345 (Tex. Crim. App. 1985). Escalante acknowledges that these cases employed the "outdated 'reasonable hypothesis'" analysis, but nevertheless contends they are instructive here. We disagree. Because *Baugh* and *O'Keefe* applied a different legal standard, one that required evidence negating every reasonable hypothesis except arson, they are not instructive here. *See McNeil v. State*, 398 S.W.3d 747, 760 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (concluding that *Baugh* and *O'Keefe* were inapposite because they were based on "a defunct legal standard.").

ignition sources that are accidental, such as an electrical fault, an appliance fault, a burning candle, or a cigarette; and there are other ignition sources that are deliberate. In conducting a scene examination, Houston looks for fire travel and fire patterns as well as heat and smoke damage. He also takes photographs of the scene as he performs his examination. After conducting a scene examination, Houston reaches an independent conclusion about where the fire started. Thereafter, Houston conducts witness interviews and further evaluates his initial conclusion.

Based on the scene examination he performed at 306 South College Street, Houston concluded that the fire originated just inside the storage room. Houston found no signs of an electrical fault, either in the shed or the circuit panel box. Houston examined the wiring for the house and found no evidence of any arcing in the wiring, which can start a fire. None of the items in the kitchen were the source of ignition for this fire. Neither the toaster nor the microwave had any internal damage, the power cords plugged into the outlets were still completely intact, and the only damage to the outlets themselves was exterior damage. Houston further found that there were no appliances in the storage shed, and there were no signs that anyone had been cooking in the shed. During his examination, Houston also ruled out that the source of the fire was "self-heating." Houston explained that a trained canine was brought to the scene to determine if the shed contained any products known to contribute to self-heating, such as linseed oil or petroleum-based paint thinners or ethers. The canine did not indicate that any such material was at the scene in this case.

Additionally, Houston found no barbecue or grill at the scene, nor did he find any discarded cigarettes. Houston said he considered discarded cigarettes because one of the inhabitants of the house stated that she sometimes smoked outside. Houston considered this possible source, but he eventually ruled it out based on the timing. According to Houston, a discarded cigarette would not have had sufficient time to ignite any of the combustible materials that were in the storage room. He explained that a cigarette—in and of itself—does not put off enough heat to self-ignite when it

is just thrown onto a piece of paper. According to Houston, a cigarette dissipates the heat faster than it generates it.

Houston ruled out any ignitable liquid as a source, such as Molotov cocktails, gas cans, and charcoal lighter bottles because the canine did not alert to the presence of any of the chemicals associated with these sources. Additionally, samples of debris from the storage room underwent laboratory testing. The lab test results revealed no ignitable liquid in the storage room. Houston ruled out the possibility that grass, brush, or trash ignited and caused the fire because there was no indication of any such burning being done, either on the exterior of the structure or inside the storage room. Houston ruled out lightning as a source because there were no storms reported in the vicinity on the night of the fire. Houston ruled out candles, which is a type of accidental open flame. Houston ruled out candles as a source because one of the inhabitants of the house told him she was allergic to candles and had no candles on the property.

Based on the scene examination, the canine's failure to alert to the presence of certain chemicals, and the laboratory test results, Houston concluded that the fire was started by "some type of intentional introduction of an unknown open flame, like a match or a lighter, to the materials that were located within the storage room, namely magazines, newspapers, cardboard boxes, and rags, and then whatever was used to ignite it was taken away from the scene." Furthermore, based on the totality of circumstances, and after ruling out other possible causes, Houston opined that the fire was caused by arson.

On cross-examination, defense counsel pressed Houston about other potential causes for the fire. First, defense counsel asked if the existence of a light in the storage shed would alter his opinion about the cause of the fire. Houston acknowledged that his initial opinion did not take into account the existence of a light in the storage shed, primarily because the inhabitants of the house had said there was no light in the storage shed. However, Houston explained that even if there was

a light in the storage shed, it would not change his opinion in this case because he was able to rule out a light as the source of the fire based on the burn patterns and the damage to the storage shed. Houston explained that this evidence indicated that the fire started low to the ground. If a light had been the source of the fire, the fire would have started higher up in the room. Next, defense counsel asked Houston whether a discarded cigarette could have been the source of the fire. Houston was aware that one of the inhabitants was a smoker, but he did not believe that a discarded cigarette was the source of the fire here. Houston explained that studies have shown that when a burning cigarette is laid down on a piece of paper, the heat dissipates too quickly for it to cause the total ignition and combustion of the paper. When pressed by defense counsel, Houston acknowledged that a burning cigarette could cause a fire under certain conditions. For example, if a burning cigarette landed on some leaves, and sunk down into the leaves, and if there was enough wind, the cigarette could be a source of ignition. Finally, Houston said he was aware that house painters had stored some painting equipment in the shed in July 2013. Houston acknowledged that under some circumstances rags soaked in paint thinners or other products could spontaneously ignite.

On re-direct examination, Houston testified that none of the scenarios posed to him by defense counsel changed his opinion that the fire was deliberately set. Houston explained that if the fire was caused by rags containing paint thinners or other flammable liquids, the canine would have alerted to the presence of these chemicals. He further explained that spontaneous ignition typically occurs when a cluster of rags is wadded up and placed together in a can. Under this scenario, some remnants of the rags survive the fire. In this case, however, no such remnants were found in the debris. Houston also testified that—regardless of the existence of a light in the shed— faulty wiring did not cause the fire because the fire started down low in the room. Houston also pointed out that he examined all the wiring and found no signs of arcing. Finally, Houston addressed the theory that the fire was caused by a cigarette discarded by one of the inhabitants of

the house. Houston had ruled out a cigarette as the cause of the fire because studies have found that heat dissipates too quickly for it to cause the total ignition and combustion of paper. Houston also thought that the timing did not support this theory; for a cigarette to have caused the fire it would have had to have smoldered over the span of several hours. Furthermore, during the scene examination, Houston did not find any cigarette butts in the area where the fire originated. Houston explained that a cigarette does not burn up entirely because its filter is made of fiberglass. In other words, if a discarded cigarette had caused the fire, some trace of the cigarette would have remained.

In his briefing, Escalante argues the evidence in this case was insufficient to support a finding that the fire was deliberately set because Houston failed to take into account three factors: (1) the existence of a light in the shed; (2) the fact that one of the house's inhabitants was a smoker who routinely smoked just outside the back door; and (3) the possibility that the fire could have ignited from the combustion of painting products. We disagree. As shown above, Houston considered and ruled out each of these factors and stated that none of them altered his opinion that the fire was caused by arson. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence was sufficient to support the finding that the fire was deliberately set.

## CONNECTION TO THE FIRE

We next examine the record for evidence that Escalante set the fire. At trial, the State presented numerous witnesses and photographs as well as a note and an audiotape recording. The evidence most pertinent to this issue is summarized below.

### Carolyn Williams

The first witness to testify at trial was Carolyn Williams. Williams lived at the house at 306 South College Street for about five years. The house was owned by her brother. Williams explained that there was a shed or a storage room at the back of the house, which contained

miscellaneous items including boxes. The shed and the house were connected by a common roof. The door to the shed was never locked.

In July 2013, Williams, who was disabled and used a wheelchair, asked Maria Gonzales if she would come to work for her as a caregiver. Gonzales agreed and came to live with Williams. Escalante would sometimes come to the house to visit Gonzales. Because Gonzales did not have a cell phone, Escalante would send text messages for Gonzales to Williams's cell phone. Williams would let Gonzales use her cell phone to view the text messages from Escalante.

Williams characterized the relationship between Escalante and Gonzales as adversarial. Williams testified that Escalante typically would come to the back of the house to talk to Gonzales or to wait for her. Escalante would sometimes sit on a lounge chair behind the house, waiting for Gonzales to come back to talk to him.

On the evening of September 5, 2013, Gonzales left the house to visit friends who lived down the street. Gonzales returned at around 11:30 p.m. According to Williams, Gonzales was "mildly hysterical" when she returned. Escalante had been waiting for Gonzales outside the house. Because Gonzales had dropped her keys, she banged on the door and asked Williams to let her in. Williams let Gonzales in, then made sure the door was locked behind her. About thirty minutes later, while Williams and Gonzales were talking in the bedroom, Williams heard a crackling noise. Gonzales went to check on the noise and discovered a fire at the back of the house. Williams called 911. Williams could see the flames of the fire through the back door window. Because of the flames, Williams could not leave the house through the back door. Williams exited the house through the front door, which was not equipped with a ramp for her wheelchair. The wheelchair ramp was located at the back of the house, but the ramp was on fire. Neighbors assisted Williams in getting down her front porch steps and across the street. Once she had crossed the street, Williams could see the smoke and flames coming up from behind the house.

Williams never saw Escalante on the property on the night of the fire; however, she did hear his voice when Gonzales returned to the house that night. Williams could tell that Escalante and Gonzales were arguing.

*Maria Gonzales*

Maria Gonzales testified that Escalante was her common law husband. The two had been together since 1998. She described their relationship as physically, verbally, and mentally abusive. Gonzales was released from jail in July 2013 after serving a sentence for assaulting Escalante. Escalante had also assaulted Gonzales in the past.

When Gonzales was released from jail, she accepted a job as Williams's caregiver and went to live with her in the house at 306 South College Street. In August 2013, Gonzales and Escalante started seeing each other again. Escalante begged Gonzales to come home to live with him, but she refused. The two began to argue again. When Gonzales was not comfortable with the way Escalante was acting, she avoided him. When Escalante could not get in touch with Gonzales, he would go crazy. He would call her on the landline telephone at Williams's house, and if he could not reach Gonzales on that line, he would call her on Williams's cell phone.

Gonzales knew that Escalante watched her. When Escalante called her, he would ask her where she was the night before. Or, Escalante would mention that he had been at Gonzales's window and had heard her talking on the phone. Gonzales, who was a cigarette smoker, would sometimes go outside to smoke behind the house. Sometimes Gonzales would find evidence that Escalante had been there. On some occasions, a patio chair would be moved from its usual place to under a tree in the yard. Once Gonzales found a pack of cigarettes, apparently left for her by Escalante.

Three nights before the fire, Escalante had called Gonzales and asked her if she was going to come over. Gonzales told him she was not, and she did not want him to come over to see her.

Escalante did not take this well. Escalante wanted to know if she was seeing someone else. Escalante wanted to know why Gonzales kept doing this to him. Gonzales told him that she did not want to be with him anymore. Escalante told Gonzales that he would come see her if he felt like seeing her.

The day before the fire, Gonzales and a friend were walking to the store when Escalante appeared out of nowhere and started talking to Gonzales. Gonzales ignored him. Escalante kept saying, "Oh really?" When Gonzales came out of the store, Escalante was still there and continued talking to Gonzales and calling her names. Gonzales told Escalante she was not going to have a confrontation in public, and she walked away from him.

At around 4:00 or 5:00 p.m. on September 5, 2013, Gonzales was outside socializing at a motel where two of her friends lived. Escalante's cousin walked by, saw Gonzales, and stopped to talk. Gonzales told Escalante's cousin not to tell Escalante where she was. Nevertheless, about an hour and a half later, Escalante walked by the motel. Gonzales went inside to avoid Escalante. When Gonzales was ready to go home that night, her friends walked her part of the way home. As Gonzales approached the deck behind the house, she heard Escalante call out to her and say that they needed to talk. Gonzales told Escalante she did not want to talk to him. At that point, a motion detector light turned on and Gonzales could see that Escalante was close. Gonzales ran up the deck, unlocked and opened the door, and went inside.[2] When she was inside, she told Williams that Escalante was outside and wanting to talk to her, but she did not want to talk to him. Gonzales also told Williams not to answer the phone.

About ten or fifteen minutes later, Gonzales and Williams heard a noise that sounded like the crackling of wood. Gonzales looked out the back door toward the deck and she could see flames

---

[2]Here, Gonzales's testimony differed from Williams's testimony. Williams testified that she opened the door for Gonzales who had dropped her keys.

coming out of the door to the shed. Williams called 911. Because the area around the back door was engulfed in flames, Gonzales and Williams exited the house through the front door. Gonzales spoke to the first deputy to arrive on the scene. Gonzales told the deputy that Escalante was trying to kill her. Gonzales was convinced that Escalante had started the fire.

The next morning Gonzales noticed that a chair had been set up against the fence on the property. On the ground below the chair were multiple beer cans, cigarette butts, and a sack of mulch. Gonzales noticed that the chair was in an unusual place. The chair had been positioned as far back on the lot as it could go. Escalante had never placed the chair up against the fence like that; he usually placed it under a tree.

Gonzales also testified about a series of text messages she received on Williams's cell from Escalante on September 6, 2013. The first text message, which was sent at 12:28 a.m., stated: "So what? You with someone else? He walked you home?" According to Gonzales, the second text message, which was sent at 1:17 a.m., stated: "So what, you be with someone else? Be a woman and answer me." The second text also accused Gonzales of "messing around." The third text, which was sent at 1:19 a.m., stated: "What, you ain't got enough balls?" The fourth text, sent at 2:07 a.m., stated: "So what up? You going to answer or not?" The fifth text, sent at 2:17 a.m., stated: "So what up Chiquita? I love you, mi amor. Love you mi amor con todo mi corazon. Always and forever." The sixth text, sent at 3:07 a.m., stated: "Cops were here. What? You got a restraining order or what? You seeing someone else? Don't lie to me. Please. That's all I ask." The seventh and final text, sent at 10:54 p.m. states, "What the fuck happened?" Photographs of the text messages were also admitted into evidence.

Finally, Gonzales testified that Escalante had recently burned some of her clothing. When Gonzales was released from jail and decided to work for Williams, she went to Escalante's house to retrieve her clothes. All of Gonzales's dresses, about twenty total, were gone. At the time, she

assumed that Escalante had simply placed the dresses in a bag and put them outside in the shed because he was mad at her. Gonzales went to the shed to look for the dresses, but they were not there. A few weeks later, after she and Escalante started seeing each other again, she asked Escalante about her dresses. Escalante told her that he had burned them all. When she asked him why he had done that, he said he just did. Escalante added that some of her dresses took him longer to burn because they meant more to him.

*Dennis Mitchell*

Dennis Mitchell testified that he lives in Rocksprings and owns the property immediately behind 306 South College Street. A fence runs along the property line. On the night of the fire, Mitchell arrived home sometime between 11:00 p.m. and 12:30 a.m. When Mitchell arrived home, the fire was already burning. Initially, Mitchell watched the fire from the front of his house; later, he watched the fire from his backyard. While in the backyard, Mitchell saw Escalante sitting in a chair and watching the fire. The chair was placed far away from the fire, up against the fence. Escalante was drinking beer. Mitchell, who knows Escalante, did not say anything to him. The next morning, Mitchell noticed empty beer cans on the ground by the chair where Escalante had been sitting and a sack of fertilizer. Mitchell recalled that Escalante had propped his feet up on the sack while he watched the fire burn.

*Yesenia Flores*

Yesenia Flores, a former Edwards County sheriff's deputy, testified that she was the first deputy to arrive on the scene of the fire at 306 South College Street. Flores described Gonzales's demeanor at the time as scared and hysterical. Gonzales told Flores about how Escalante had confronted her outside of Williams's house shortly before the fire and how she had refused to talk to him. Gonzales also told Flores that she thought Escalante had set the fire because he wanted to kill her. Based on Gonzales's story, Flores thought the fire was set intentionally. After the fire was

out and the site was secure, Flores and another officer went to Escalante's house to talk to him. They knocked on the door repeatedly, but Escalante did not answer the door. A few days later, Flores reviewed a videotape taken at a local convenience store at 6:00 a.m. on September 6, 2013. The videotape showed Escalante buying a twenty-ounce bottle of Coca-Cola.

*Mark Allen Cox*

Cox testified that he was also employed as an Edwards County sheriff's deputy. Cox said he arrived at the fire at 306 South College Street at 12:35 a.m. on September 6, 2013. According to Cox, the fire was extinguished by 1:08 a.m. At around 2:00 a.m. or 2:15 a.m., Cox went to Escalante's house to talk to him. Cox was accompanied by Flores. Cox worked his way around the house, knocking on all its doors and windows. No one responded. Cox said he knocked so loudly that he was concerned that Escalante's neighbors would complain.

Later that morning, Cox returned to 306 South College Street. Cox noticed a Coca-Cola bottle on the handrail of the ramp that led to the back door. Under the Coca-Cola bottle was a handwritten note from Escalante to Gonzales. The Coca-Cola bottle and the note were not there the night before. At trial, Cox read portions of the note, which stated in part: "Chiquita, what is your problem? Are you seeing someone else or what? Just let me know. Someone was walking you home last night, right?" The note also stated, "Is this what you really want? Why?" The Coca-Cola bottle and the note placed Escalante at the scene of the house after the firefighters and deputies had left.

*Bobby Buscha*

Another deputy sheriff, Bobby Buscha, testified that he participated in the investigation of this case. The day after the fire, he and Cox located Escalante at his workplace. Buscha drove Escalante to the sheriff's office so Cox could interview him. On the way to the police station, Buscha went to 306 South College Street. When they drove up to the house, which was obviously

damaged by the fire, Escalante yelled something to the effect of, "What the fuck happened? Where is my wife?" Escalante's reaction was "extremely loud," "startling," and "it seemed a bit exaggerated." Escalante said nothing about going to the house earlier that morning to leave a note and a Coca-Cola bottle on the ramp handrail.

### Greg Houston

In addition to his testimony about the origin and cause of the fire, Houston testified that when he arrived at 306 South College Street on the morning of September 6, 2013, the house was cordoned off with crime scene tape. Houston noticed and photographed the Coca-Cola bottle and the note on the handrail. Houston pointed out these items could not have been there during the fire because the objects were devoid of smoke or soot deposits.

### Rene Escalante

Escalante testified on his own behalf at trial. Escalante denied that he set the fire at 306 South College Street. Escalante admitted that while Gonzales was in jail he had burned two or three of her dresses. Escalante said that Gonzales had been losing a lot of weight, and he had bought all of her clothes. At the time, Escalante was cleaning out his closet, and he burned some of his own clothes with some of Gonzales's dresses. Escalante added that the dresses he burned were stained. Escalante had a hole in his back yard, where he burned stuff all the time. Escalante also gave about 10 or 12 of Gonzales's dresses to his next door neighbor.

Escalante testified about the status of his relationship with Gonzales. Gonzales and Escalante resumed their relationship when Gonzales was released from jail. Sometimes Gonzales would spend the night at his house, and sometimes he would stay with her at the house at 306 South College Street. Escalante had been inside the shed; he had helped Gonzales move boxes in there. Escalante and Gonzales would sometimes sit outside on the back porch. Escalante said he had a job opportunity in Seguin, and he and Gonzales had planned to move there together.

However, Escalante also noticed that Gonzales was becoming more irritable. Escalante attributed Gonzales's irritability to stress related to her work. Escalante said that he and Gonzales were trying to give each other a little bit of space. Escalante denied that he was stalking Gonzales.

On September 5, 2013, Escalante came home from work at around 5:30 p.m. Escalante walked by the motel and saw Gonzales outside on the porch with some of her friends. When Gonzales saw Escalante, she went inside. This struck Escalante as odd, and he wondered why Gonzales was hiding from him. Escalante then went to talk to neighbors, grabbed some dinner out, bought a six-pack of beer, drank two beers, and continued to socialize with neighbors. Escalante decided to go to 306 South College Street to wait for Gonzales to come home, which was not uncommon for him to do. When he arrived at the house, Escalante grabbed a chair at the back of the house and sat there, drinking beers, smoking a couple of cigarettes, and playing games on his phone. Over the course of the evening, Escalante consumed two Smirnoffs, a six-pack of beer, and a natural light. When Escalante saw Gonzales walking toward the house, he got up and walked toward her. Gonzales told him that she did not want to talk to him. Escalante explained that he wanted to talk to her, but Gonzales refused and told him he needed to go home. Gonzales unlocked the door, walked in, and told him again that he needed to leave. Gonzales warned him that if he did not leave, she would call the police. At that point, Escalante said that he walked back down the ramp and off the property and went straight home. Escalante denied that he stopped by the shed, walked in, and lit something in there on fire. Escalante added that it would not have been easy for him to get into the shed because the nearby walkway and the door were "booby trapped" with posthole diggers and other equipment.

Escalante testified that he arrived home at about 11:00 p.m. Escalante started texting Gonzales around 12:30 a.m. because he could not fall sleep. Escalante was irritated when Gonzales did not respond, but said that this was pretty typical for their relationship. Escalante then fell

asleep. Escalante said he never heard the deputies knock on the door, explaining that his room is in the middle of the house. At around 3:00 a.m., Escalante sent Gonzales a text that made reference to the cops' presence at his house because he had received a notification on Facebook. Escalante woke up at 4:30 a.m., wrote the note to Gonzales, and took it over to the house at 306 South College Street before 5:00 a.m. Escalante did not see the crime scene tape around the property, and did not remember crossing the tape. It was still dark out. Escalante walked up to the back door ramp railing, set the note on the railing, and placed the Coca-Cola bottle on top of it. Escalante said that he had obtained the Coca-Cola bottle from his house. Escalante then went home, finished making his lunch, and went to work.

Later that day, a sheriff's deputy arrived at Escalante's work, and said that one of the deputies wanted to talk to him. The deputy drove Escalante to the house at 306 South College Street. This was the first time Escalante noticed that there had been a fire at the house, and he was concerned for Gonzales and Williams. During his interview, Escalante told the deputy that the biggest problem he and Gonzales had was that she did not want to come home to live with him.[3]

On cross-examination, Escalante admitted that he carried a lighter on him. He further admitted that on the evening of September 5, 2013, he sat on the lawn chair in the back yard, drank beer, and smoked cigarettes. Nevertheless, Escalante denied that he sat there watching the fire as it burned. Escalante said that Mitchell's claim that he had seen him watching the fire was a lie. Escalante denied that he was intoxicated on September 5, 2013, or that he sometimes lost his memory when he was intoxicated. Escalante denied that he was stalking Gonzales. Escalante said that when he left the note and the Coca-Cola bottle on the ramp handrail he did not notice that the house and storage room had been burned.

---

[3]The jury also heard the audio recording of this interview.

- 17 -

In reviewing sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense. *Hooper*, 214 S.W.3d at 13. The facts need not point directly and independently to the guilt of the appellant. *Id*. We consider whether the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id*. The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Merritt*, 368 S.W.3d at 525. The jury is permitted to draw multiple reasonable inferences from facts, as long as each is supported by the evidence presented at trial. *Id*.

Viewed in the light most favorable to the jury's verdict, there was sufficient evidence to support the jury's finding that Escalante set the fire. Escalante knew the layout of the house and was familiar with the storage shed and its contents. Three days before the fire, Gonzales had told Escalante that she did not want to be with him anymore. Escalante nevertheless followed Gonzales around town, trying to talk to her. Gonzales repeatedly avoided him. Escalante was angry and jealous as established by the testimony of several witnesses, text messages, and a note. It is undisputed that Escalante was on the property shortly before the fire. Escalante was sitting in a chair behind the house waiting for Gonzales. However, when Gonzales came home, she refused to talk to him. Just ten or fifteen minutes after Gonzales refused to talk to Escalante, Gonzales and Williams heard the crackling of wood and noticed the flames outside the back door. While the structures were burning and the firefighters were trying to extinguish the fire, a neighbor saw Escalante sitting in a chair at the back of the property and drinking beer. The next morning, Gonzales noticed a chair positioned at the back of the property. The ground below the chair was littered with beer cans and cigarette butts. The chair was in an unusual place; it was situated against the fence, as far away from the house as possible.

Escalante's own account of the events of September 5 and 6, 2013, further supported the jury's finding that Escalante deliberately set the fire. Parts of Escalante's story were contradicted

by other evidence. Escalante testified that he was home by 11:00 p.m. on September 5, 2013. However, several hours later, when law enforcement officers visited his house and knocked on the doors and windows, Escalante did not respond. Other evidence showed that Escalante was aware of the visit from law enforcement officers, because he sent a text message to Gonzales at 3:00 a.m. stating the cops had been to his house. Escalante also testified that he went to 306 South College Street before 5:00 a.m. on September 6, 2013, to leave a note for Gonzales, and that he brought a bottle of Coca-Cola from his house. Escalante further testified that after he delivered these items, he went home, made his lunch, and went to work. However, a convenience store videotape showed Escalante buying a bottle of Coca-Cola at 6:00 a.m. on September 6, 2013. When a deputy brought Escalante to the house the next day, Escalante acted like he was unaware that the house had been destroyed by fire. According to one deputy, Escalante's reaction seemed "extremely loud" and "exaggerated." Escalante should not have been surprised by the fire because he had been to the house earlier that morning and the fire damage was obvious. Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are circumstances indicating guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Here, Escalante's conduct after the fire—his avoidance of the deputies when they went to his house, his return to the scene of the fire later that morning, his feigned surprise when he was taken to the house later the same day, and his attempts to cover up some of his actions—supported an inference of guilt.

In his briefing, Escalante emphasizes that no one saw him set the fire. However, such direct evidence was not necessary to establish Escalante's guilt. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13; *see Krebsbach v. State*, 962 S.W.2d 728, 734 (Tex. App.—Amarillo 1998, pet. ref'd) ("[U]nlike [in] the movies and on television,

- 19 -

circumstantial evidence can be used to convict one of arson."). Escalante further contends that there were only three facts connecting him to the fire: (1) his presence on the property shortly before the fire; (2) Mitchell's testimony that he saw Escalante sitting in a lawn chair on the edge of the property watching the fire burn; and (3) Escalante's leaving a Coca-Cola bottle and a note on the ramp handrail the day after the fire. We disagree. Other facts connected Escalante to the fire. Escalante avoided the officers who came to visit him at his house immediately after the fire was extinguished. Escalante failed to admit that he was present on the property to watch the fire burn. Escalante feigned surprise when he was taken to the charred house the day after the fire. And, in the past, Escalante had disposed of Gonzales's dresses by burning them. Furthermore, there was evidence that Escalante had a motive to set the fire: Escalante suspected that Gonzales was cheating on him, three nights before the fire Gonzales had told him that she did not want to be with him anymore, Escalante was upset that Gonzales was ignoring him and refusing to talk to him, and Escalante desperately wanted Gonzales to come back to live with him. Considering the combined and cumulative force of the evidence and viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence was sufficient to support the finding that Escalante set the fire.

CONCLUSION

We conclude the evidence was sufficient to support the elements of the offense challenged on appeal. The judgment of the trial court is affirmed.

Karen Angelini, Justice

Do not publish