# Court of Appeals
## Tenth Appellate District of Texas

### 10-24-00054-CR

Darius Kytrell Evans,
Appellant

v.

The State of Texas,
Appellee

On appeal from the
278th District Court of Walker County, Texas
Judge Hal R. Ridley, presiding
Trial Court Cause No. 28907

JUSTICE HARRIS delivered the opinion of the Court.

## MEMORANDUM OPINION

Darius Kytrell Evans was convicted by a jury of the first-degree felony offense of Injury to a Child Causing Serious Bodily Injury and was sentenced by the trial court to 25 years in prison. *See* TEX. PENAL CODE § 22.04(a)(1), (e). Because the evidence is sufficient to support the conviction, but because the fine and reimbursement amounts noted on the judgment were erroneous, the trial court's judgment is modified to remove those amounts and affirmed as

modified.

**BACKGROUND**

In the early afternoon of September 5, 2018, K.T., a 19-month-old child, was rushed to Huntsville Memorial Hospital by Evans and his then fiancée, later wife, Hailey. K.T. was seizing and non-responsive. He was initially treated at Huntsville Memorial and then life-flighted to Texas Children's Hospital in Houston. CT scans showed that K. T. had a large skull fracture on the side of his head, and his brain was swelling and was bleeding in multiple areas which could become fatal. After emergency surgery to drain fluid from K.T.'s brain, doctors discovered that K.T. also had fractures in his upper-arm/shoulder area, near his wrist, and in his hand.

K.T. was placed on the child abuse floor at Children's, and Evans quickly emerged as the suspect in K.T.'s injuries. Evans and eventually Hailey were banned from the hospital. After two months, K.T. was discharged from Children's into the care of Hailey's mom, Susan. By the time of the trial, and according to Susan, K.T. showed no signs of physical or developmental delays.

**SUFFICIENCY OF THE EVIDENCE**

In his first issue on appeal, Evans contends the evidence is insufficient to support his conviction. Specifically, he contends the State had no direct evidence of the acts alleged in the indictment, including that Evans

intentionally or knowingly caused serious bodily injury.

### *Standard of Review*

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires us to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232.

Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).

We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State,* 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). As such, the jury can choose to believe all, some, or none of the testimony presented by the parties. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

Our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

### *Proof Beyond a Reasonable Doubt*

To find Evans guilty, the jury was required to find, beyond a reasonable doubt that:

> 1. the defendant, in Walker County, Texas, on or about the 5th day of September, 2018, caused injury to [K.T.] by
>
>> a. causing the acceleration and deceleration of [K.T.]'s body

with the defendant's hand or unknown object, or
b. grabbing and pulling [K.T.] with the defendant's hand, or
c. striking [K.T.] with or against an unknown object, or
d. squeezing [K.T.] with the defendant's hand, or
e. squeezing [K.T.] with or against an unknown object, and

2. [K.T.] was a child fourteen years old or younger;

3. the injury caused to [K.T.] was serious bodily injury; and

4. the defendant

a. intended to cause serious bodily injury to [K.T.]; or
b. knew he would cause serious bodily injury to [K.T.].

You must all agree on elements l through 4 listed above, but you do not have to agree on element 1.a, 1.b, 1.c, 1.d, or 1.e, or element 4.a or 4.b above.

There was no dispute that K.T. suffered a traumatic brain injury.

There was no dispute that K.T. was healthy and happy in the days before his brain injury.

There was also no dispute that Evans was the only person around K.T. in the hours before K.T. was rushed to the hospital.

The dispute is whether K.T.'s injury was intentional rather than accidental, whether the injury was considered to be serious bodily injury and whether Evans was the one who injured K.T. and in any of the manner and means alleged in the indictment. Evans criticizes the State for not producing direct evidence on the disputed issues. But, as the Court of Criminal Appeals has stated, circumstantial evidence is as probative as direct evidence and may

be sufficient alone to uphold a conviction as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. And in this case, the cumulative force of the incriminating evidence is sufficient to support Evans' conviction.

### State's Case

Evans and Hailey lived together with Hailey's two children D.T. and K.T. Evans usually worked from 3:30 or 4:00 in the afternoon until 12:00 or 1:00 in the morning. And, according to Hailey, Evans was the sole caretaker of K.T., who was described by Hailey as an energetic, climbing-on-everything toddler, while Hailey was at work during the day.

On September 5th, Evans had returned home from work at about 1:00 or 1:30 in the morning. He celebrated Hailey's birthday with her which had been the day before and went to bed. Waking up later in the morning, he realized that "they" were late.[1] Hailey woke D.T. to get dressed and then got herself ready for work. Evans dropped Hailey off at work and D.T. off at school and returned home. K. T. had been left at home[2] because he was sleeping and

---

[1] In his second interview, Evans said that D.T. missed the school bus and that they all got up to take Hailey to work and D.T. to school. He did not say that Hailey was late for work. During his trial testimony, Evans said Hailey was late for work. He also said that D.T. was not able to catch the bus at the time. This aligns with Hailey's trial testimony, but not her statement to an investigator, about needing to go to the school to fill out bus-pick-up paperwork.

[2] Hailey testified it was her decision to leave K.T. at home while Evans testified that it was his decision to leave K.T. at home.

had been given Tylenol the night before for symptoms of teething.

When Evans returned home approximately 30-40 minutes later, he did not check on K.T. but went straight to his room to play video games. He testified at trial that the TV volume was moderately loud. Around 11:00 a.m., he texted Hailey asking which plate of ribs was his. Sometime afterward, he went to the kitchen to get the ribs. Evans' story varied about when and how he later checked on K.T. When first interviewed, Evans said he did not check in on K.T. until Hailey called around noon to tell Evans to come pick her up.[3] At Evans' second interview, Evans said that he looked in K.T.'s room as he walked by to get his food. At trial, he said that when he got hungry, he walked to the kitchen and "kind of peaked in" K.T.'s room and saw that K.T. was still asleep. Photographic evidence revealed, and Hailey confirmed, that K.T.'s bed could not be seen though the open doorway to his bedroom. His bed was behind the door.

By approximately 12:20 p.m., Evans texted Hailey that K.T. was "on the floor knocked out." Ten minutes later, he texted her that K.T. was "passed out

---

[3] The reason for Hailey's call varied as well. In his first interview, Evans said she was ready to be picked up. During his second interview, he said she was getting off early. At trial, Evans said Hailey called to tell him to take K.T. to Susan's house. In a statement to an investigator, Hailey said she called Evans to be picked up from work because the school called and was having "issues" with D.T. This was the reason Susan said at trial why she was going to pick up D.T. from school. At trial, Hailey testified she needed to be picked up from work because D.T.'s school wanted Hailey to finish bus-pick-up paperwork which was due that day. The school principal testified that she was not aware of anyone at the school calling Hailey that day for any reason.

or sumn." Evans' story varied as to the condition in which he found K.T. First, he said K.T. was in his bed crying but would not open his eyes. The next time he was interviewed, he said he found K.T. on the floor in between the bed and the dresser[4] while he was on the phone with Hailey. Then, at trial, he said K.T. was face down on the floor, but on his side, away from the toys that were next to his bed on the floor and with his head pointed toward the head of the bed and near the dresser.[5] About that time, Hailey called wondering what was going on and is then seen on her work's surveillance video exiting the building. Evans put K.T. in the car and headed to the hospital, stopping briefly to pick up Hailey who was waiting across the street from her work.

Two doctors testified for the State regarding K.T.'s injuries. Dr. Stephen Antwi was the medical director of the emergency department and trauma services at Huntsville Memorial Hospital at the time of K.T.'s brain injury. Dr. Antwi has an extensive understanding of neuron function and anatomy of the brain for children. He reviewed CT scans and other scans and records of K.T. on the day K.T. was rushed to the hospital.[6] Dr. Angela Bachim, employed by

---

[4] A photograph admitted into evidence showed that toys were piled up in between the bed and the dresser.

[5] This description of K.T.'s body position cuts against the defensive theory that K.T. jumped from the dresser and hit his head on the floor.

[6] Evans discounts much of Dr. Antwi's testimony especially when he called himself "a lowly ER doctor." This statement was taken out of context. Dr. Antwi had been asked if he could narrow down the approximate time of K.T.'s injuries to less than within the last 24 hours. He replied, "No, maybe a forensic pathologist could; but, no, I mean, as a lowly ER doctor, no, I can't."

Baylor College of Medicine, is on the faculty at Texas Children's Hospital in Houston. She is board certified in child abuse pediatrics. She is also the program director for the child abuse pediatrics fellowship at Baylor College of Medicine. She reviewed K.T.'s records from his stay at Children's.

The cumulative force of their testimony showed that K.T. had a lineal fracture on the side of his head, 8 cm long, which was also branching. He had "acute," which means recent, bleeding in multiple levels in his brain. Dr. Bachim said the bleeding was no more than three hours old. CT scans shown to the jury indicated large areas of white in K.T.'s brain which the doctors attested to be the acute bleeding in the brain. He also had blood going down the middle of his head which was very rare with accidental injuries. As Dr. Bachim testified, "It takes a lot of force to get blood going down into the intra-hemispherical portion of the brain."

Additionally, K.T. suffered a midline shift in his brain which meant the brain had shifted off-center.[7] K.T.'s brain also showed signs of "coup and contrecoup" which meant that his brain hit one side of his skull and bounced back to hit the other side. According to Dr. Antwi, this would take a tremendous amount of force in order to, not only have injuries on the actual

[7] By the time he was discharged from Children's, he had also lost a small amount of brain matter.

initial injury side of the brain, but also have injuries potentially on the opposite side of the brain. Further, K.T. suffered intra-retinal hemorrhages which were in the layers of the retina and some in the middle of the back of the eye.

Both doctors determined that K.T.'s fracture and brain injuries were not accidental. As Dr. Antwi stated,

> And so it would take a tremendous amount of force, not an amount of force from patting someone, not an amount of force from again falling a foot, four foot from the ground without landing on some specific, you know, structure. It would take an increased amount of force likely against something.

> So him being forcibly thrown or pushed into some static hard object could cause him being – you know, in toddlers one of the things we find is that people will pick them up by their legs and kind of sling them. And so that being then hit against a forceful object could cause it.

Although only Dr. Bachim was asked if she considered K.T.'s brain injuries to be serious bodily injury, which she replied affirmatively, both doctors considered the brain injuries to be life threatening; and if the swelling was not relieved quickly, K.T.'s brain would push down into his brainstem which would cause death. The natural "sutures" in K.T.'s skull and the fracture had already separated from the pressure by the time he arrived at Children's.

### Defensive Theories

Evans presented defensive theories that K.T. may have suffered his brain injuries from falling out of bed or hitting his head on the nearby dresser

or jumping off of the dresser; but both doctors discounted these theories. While they agreed that skull fractures could occur, they determined it was improbable that the amount of injury to K.T.'s brain itself could have occurred in those scenarios.[8]

Evans also presented a theory through Hailey and Susan, that K.T.'s fracture and brain injuries were actually caused a year prior when the family had been in a serious car accident. This theory was first brought to light at K.T.'s last office visit with Children's over a year after the injuries when Susan mentioned that she believed the car accident caused K.T.'s injuries and they had filed a lawsuit.[9] Hailey testified that Susan had conducted extensive research and concluded that the car accident caused hydrocephalus in K.T.'s brain which slowly developed over time, culminating in the fracture and brain injury on September 5, 2018. Both doctors also discounted this theory for at least two reasons: (1) the ventricle on the injured side of the brain was decompressed or made smaller rather than expanded as it would be with hydrocephalus; and (2) had K.T. had a skull fracture or a traumatic brain injury from the car accident, the injury would have presented in his behavior

---

[8] Speaking of the injuries in K.T.'s brain, Dr. Bachim stated, "it's not just the fracture; it's the whole constellation of injuries. We can see kids with a simple linear skull fracture in that bone just because they were, you know, learning to walk and fell on a tile floor. You know, kids fall, skull fractures happen. It's everything going on inside his head that makes it way worse."

[9] The lawsuit was non-suited because the medical records from the car accident did not support the theory of their suit.

almost immediately rather than a year later. The doctors opined that if the day before the September 5, 2018 injury, K.T. was eating, taking a bottle, laughing, and seemed happy and healthy, as it was depicted at trial, K.T. could not have had that skull fracture and that amount of bleeding at that time.

### *Conclusion*

There were enough inconsistencies in the stories of Evans, Hailey, and Susan that the jury was well within confines of the law to disbelieve anything that was said by them in deflecting blame for K.T.'s injuries from Evans. Likewise, in light of the medical testimony, the jury could have believed that someone hit K.T., or hit his head against something, so hard, his skull fractured, his brain hit both sides of his skull, bled, and the midline shifted; and the only person around K.T. that could have caused those injuries was Evans. Accordingly, reviewing the evidence in the light most favorable to the verdict, we find the cumulative force of all the incriminating circumstances is sufficient to support the conviction. Evans' first issue is overruled.

### FINE

Next, Evans complains that the trial court erred in assessing a fine of $100 in the judgment when it was not orally pronounced. The State concedes error. Accordingly, Evans' second issue is sustained, and the trial court's judgment is reformed to delete the assessed $100 fine.

**REIMBURSEMENT FEES**

Lastly, Evans complains that the trial court erred in assessing reimbursement fees in the amount of $335. Again, the State concedes error. Accordingly, Evans' second issue is sustained, and the trial court's judgment is reformed to delete the assessed $335 in reimbursement fees.

**CONCLUSION**

Having sustained Evans' second and third issues, but having overruled his first issue, we modify the trial court's Judgment of Conviction by Jury—Sentence by Court to delete the assessed $100 fine and $335 reimbursement fees and affirm the judgment as modified.

_____

LEE HARRIS
Justice

OPINION DELIVERED and FILED: April 24, 2025

Before Chief Justice Johnson,
     Justice Smith, and
     Justice Harris
Affirmed as modified
Do Not Publish
[CRPM]

